871 So.2d 674 (2004)
STATE of Louisiana, Pontchartrain Levee District
v.
ST. CHARLES AIRLINE LANDS, INC.
Nos. 03-CA-1292, 03-CA-1293, 04-CA-20.
Court of Appeal of Louisiana, Fifth Circuit.
April 27, 2004.
Rehearing Denied May 21, 2004.
*677 R. Ryland Percy, III, Katherine T. Percy, Gonzales, LA, for Plaintiff/Appellant.
Randall A. Smith, Andrew L. Kramer, L. Tiffany Davis, New Orleans, LA, for Defendant/Appellee.
James J. Coleman, Sr., New Orleans, LA, for Defendant/Appellee.
Panel composed of Judges SOL GOTHARD, CLARENCE E. McMANUS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
This consolidated appeal arises from the expropriation by the State of Louisiana, Pontchartrain Levee District ("Levee District") of certain properties owned by St. Charles Airline Lands, Inc. ("SCAL"), for the purpose of building a hurricane protection levee. In 1965, Congress authorized a project for levee construction along the banks of Lake Pontchartrain in order to provide hurricane protection to the parishes of St. Charles, Jefferson, Orleans, and St. Bernard. The property at issue in this case is located in St. Charles Parish adjacent to and along the north side of U.S. Highway 61, commonly referred to as Airline Highway. It begins near the intersection of Airline Highway and the Interstate 310 interchange and extends nearly two miles to Ormond Boulevard. The subject property is designated as wetlands.
The Levee District instituted expropriation proceedings by filing petitions for expropriation, pursuant to LSA-R.S. 38:351, et seq., on May 31, 1991, and January 24, 1994[1], and orders of expropriation were signed for the property sought in each petition. The Levee District deposited its estimate of just compensation for the taking of each property into the registry of the court, which was $24,104 for the 1991 taking and $47,595 for the 1994 taking. The Levee District based its calculation of just compensation on its belief that the property consisted of undevelopable wetlands. SCAL contested the amount of just compensation deposited by the Levee District in each suit, arguing that the value of the property was much higher than estimated by the Levee District and that SCAL was also entitled to severance damages. SCAL argued that the property was not undevelopable and that the highest and best use of the property at the time of the takings was for commercial and residential development.
A four-day trial began on January 13, 2003 and concluded on January 17, 2003. At trial, in order to establish that the property's highest and best use at the time of the expropriations was residential and commercial development, SCAL had the burden of proving that it could have obtained permits to develop the property from the Louisiana Department of Natural Resources ("DNR") and the U.S. Army Corps of Engineers ("Corps") at the time of the takings.
On March 11, 2003, the trial court rendered a judgment in favor of SCAL, finding that there was a reasonable probability that the requisite wetland permits could have been obtained at the time of the takings to develop the property to its highest and best use, which was commercial *678 and residential development. The trial court awarded additional compensation in the amount of $1,326,338.60 for the 1991 taking, and $1,742,081.90 for the 1994 taking. This award includes additional just compensation for the property actually expropriated, compensation for temporary construction servitudes, and severance damages for the remaining property that was adversely affected by the takings.
A hearing on SCAL's Motion to Determine Attorney's Fees, Expert Fees, and Costs was held on August 6, 2003. On September 25, 2003, the trial court rendered a judgment in favor of SCAL, awarding attorney fees in the amount of 10% of the additional compensation awarded at trial and interest, expert fees in the amount of $151,435.79, and costs in the amount of $15,186.87.
The Levee District filed appeals from both the judgment on the trial on the merits and the judgment awarding attorney fees, expert fees, and costs, and these appeals were consolidated by this Court. On January 20, 2004, SCAL filed an answer seeking an increase in the amount of attorney fees awarded.

TRIAL TESTIMONY
At trial, both the Levee District and SCAL introduced evidence and testimony regarding wetlands permitting and valuation of the property.
SCAL presented the testimony of Bennett Oubre, who was accepted as an expert in real estate appraisal. He stated that the subject property, which is north of Airline Highway, is 307 acres owned by SCAL. He believes that the I-310 interchange opened in June of 1991 and was going to bring a significant impact to St. Charles Parish as far as development potential. The property at issue in this case is the first property that is present just after exiting I-310, and he believes it was well-suited for commercial and residential development in 1991. As an appraiser, he considered many factors in valuing the property, including permittability. He opined that it was probable that SCAL would have received permits for the property in the reasonably foreseeable future.
Mr. Oubre valued the subject property at $12,000 per acre prior to the 1991 taking, and he opined that the compensation for use of SCAL's property for the temporary servitude during construction should be determined by using 9% of the value of each acre used. He stated that there is no reasonable, feasible, financial way to develop the remaining property at this point because of the alignment of the levee through the property. Therefore, he opined that severance damages should be awarded, and he estimated these damages at $1,393,285.
With regard to the 1994 taking, Mr. Oubre believed the property should be valued at $14,000 per acre, and 9% of this value per acre should be used to determine the value of the temporary servitude required to construct the levee. He further opined that the remainder of the property had no economic value after the taking, so severance damages of $1,581,257 should be awarded.
On cross-examination, Mr. Oubre agreed that $700 is within the range of value for undevelopable wetlands, but he believed the property could have been permitted and developed. He stated that most of St. Charles Parish and the Greater New Orleans region were wetlands at one time.
SCAL called George Castille, III to the stand. Dr. Castille is employed by Coastal Environments, Inc., and he was accepted by the court as an expert in the fields of historical geography and navigability of waterways. He researched the history of permits and the probability of obtaining a permit in this case, based on historical *679 trends and projections for the subject property. He stated that the vast majority of the property that has been developed along Airline Highway was wetlands at one time. Further, the majority of lands developed in the New Orleans area were originally wetlands and there has been a constant effort to utilize wetlands for human needs.
In addition to photographing sites and researching permits, Dr. Castille looked at the data supplied by DNR and the Corps regarding the percentage of permits that are granted. He stated that both a DNR permit and a Corps permit would have been required to develop this property. He indicated that less than 1% of DNR permit applications in St. Charles Parish and less than 1% of Corps permits in the New Orleans District were denied from 1985 to 1990. He believes that there is a reasonable probability that the property would have received a permit in 1991 or 1994.
SCAL presented the testimony of Claude Edwin Fike, IV, who is employed by Coastal Environments, Inc. From 1986 to 1991, he worked for the Lafourche Parish Council as the Coastal Zone Management Administrator and Planning Director where he made recommendations regarding coastal use and wetlands permits. Since he has been employed with Coastal Environments, he has worked with wetland permitting, as well as environmental site assessments and environmental impact statements. He was accepted by the court as an expert in the field of wetlands permitting and its application procedures.
Mr. Fike reviewed the subject property, its location, and the major characteristics of the land. He also reviewed permit applications for property in the area of the subject property before, during, and after the time of the takings. It is his opinion that there is a very reasonable probability that permits would have been issued by DNR and the Corps in 1991 and 1994 for the subject property. He has never had any of his 70-80 permit applications denied by the Corps or DNR. Further, because this is the first property off the I-310 interchange, the probability that the property would have received the necessary permits was increased.
SCAL also presented the testimony of Wade Ragas, who was accepted as an expert in market analysis, real estate appraisal, financial feasibility, and the 404 permit application process for needs assessments. He testified that St. Charles Parish grew rapidly from 1980 to 1990, and there should have been more commercial development based on the population growth. He stated that the SCAL property would have been suitable for a "big box" development, such as Wal-Mart, because of its deep property lengths, and there was a public need for such a development, due to the lack of such retail stores in that area. He also stated that the development would have generated a significant and positive economic impact for St. Charles Parish because of the sales taxes and available jobs it would have created. He further testified that residential development would have been attractive, because the property offered water-dependent, singlefamily housing.
Dr. Ragas did an alternative site assessment for residential development and found no non-wetland sites on the eastbank, with water access and trees, that was greater than 15 acres and available for sale in 1991 or after. He looked for commercial alternative sites on the eastbank, with significant frontage on Airline Highway, consisting of 20 or more acres, and available for sale in 1991, but he did not find any such comparable property.
Dr. Ragas concluded that the highest and best uses of the property before the *680 taking were residential development, with water-dependent, single-family housing, and commercial development, just after exiting the I-310 interchange. He further believed that there was a reasonable probability that the site could have been permitted for such uses.
His valuation of the land in 1991 was $8,850 per acre, and it was $9,850 per acre in 1994. Temporary servitudes were calculated on market interest rates in the 7-10% range. He calculated the total just compensation for the 1991 taking to be $1,382,000, and it was $2,012,000 for the 1994 taking.
William Monteleone, III, is the current president of SCAL and has been on the Board of Directors for 10 years. He stated that SCAL was formed in 1932 for the purpose of acquiring, purchasing, and developing real estate. He first became involved with the corporation in 1993, and there were plans to develop the property at that time. The property had not been developed in the 1970's or 1980's, because they were continually confronted with the uncertainty of the bridge and I-310 alignment, as well as the alignment of the flood protection levee, which made them unable to determine the best plan for development.
The Levee District presented the testimony of Peter Talluto, who was accepted as an expert in real estate appraisal. He testified that the subject property was zoned as wetlands. He stated that he believed the property was worth about $700.00 per acre and estimated the just compensation for the 1991 taking to be $21,256. He did not believe that severance damages should be awarded because he believed that the highest and best use before and after the taking was as undevelopable wetlands with very limited and restricted use. He opined that just compensation for the 1994 taking was $45,574.
On cross-examination, Mr. Talluto admitted that he has not appraised any jurisdictional wetlands in St. Charles Parish, other than this property, and he has not been involved with any permit applications for development of wetlands himself. He opined that the highest and best use for the property was for hunting, fishing, recreation, and possible mitigation.
The Levee District also presented the testimony of Scott Nesbit, who is the Director of the Ecological Group for CK Associates, which is an environmental consulting firm. His division does wetlands works, covering all types of environmental permitting. He was accepted as an expert in wetlands permitting, delineation, and mitigation.
Mr. Nesbit stated that the subject property lies within the Louisiana Coastal Zone and requires a Coastal Use Permit to develop the property. He testified that the first step to obtain a permit requires demonstrating a public need for the proposed activity. The second step is alternative site analysis, and the third step is sequencing. He testified that there would have to be a considerable demonstration of public need in order to permit 150 acres or more of wetlands, because the benefit of residential or commercial development in this area is small. With regard to alternative site analysis, he stated that the applicant must show that there is not another site for the proposed activity with less impact on wetlands. Sequencing is a process where the applicant must demonstrate that he has tried to minimize the impact to the maximum amount of wetlands, and then he can mitigate for the impact.
In Mr. Nesbit's opinion, the property would not have been permitted in 1991 or 1994, because there was plenty of undeveloped land for sale in the 40 to 60 to 80 acre range with less impact on wetlands. He *681 considered areas north and south of Airline, on the westbank and eastbank, wet and non-wet. Based on his site analysis, he opined that 300 acres of wetlands would not have been permitted for commercial or residential development.
On cross-examination, Mr. Nesbit admitted that during his alternative site analysis, he looked at property that was 100 acres or less, he did not know the exact acreage of the subject property, and he did not know which sites were available prior to 1998. He did not find any sites greater than 100 acres on Airline Highway that were non-wetlands within a 5-mile radius. He has been involved with over 100 permits applications and none of them have been denied.
The Levee District called Earl Matherne to testify. He is employed by the St. Charles Department of Planning and Zoning as their Coastal Zone Manager. His department deals with zoning and subdivision approval permits, and it issues building permits. He stated that there is a good chance that a zoning change will be granted when a wetlands permit has been obtained. He stated that approximately 75% of St. Charles Parish is technically wetlands. He further stated the placement of the I-310 in the early 1990's was a great, positive development for the area and St. Charles Parish.

LAW AND DISCUSSION
The Levee District is granted statutory authority to expropriate property for levee purposes under LSA-R.S. 38:351, et seq. However, the owner of property taken for the purpose of constructing a levee must be compensated "to the full extent of his loss." Louisiana Constitution, Article 1, Section 4; LSA-R.S. 38:387(C). "Just Compensation" is based on the fair market value of the property taken, which is its highest and best use as of the date of the taking, and includes severance damages when the taking has adversely affected the value of the remainder of the property. LSA-R.S. 38:387; West Jefferson Levee District v. Mayronne, 595 So.2d 672, 679 (La.App. 5 Cir. 1/31/92), writ denied, 605 So.2d 1094 (La.9/4/92). Under the "highest and best use" doctrine, the landowner is entitled to compensation based on the potential use of the property, even though the property is not being so utilized at the time of the taking, if the landowner can show that it is reasonably probable that the property could be used for that purpose in the not too distant future, absent the expropriation and the project for which the property was expropriated, and provided such use would have an effect on the price the buyer is willing to pay. West Jefferson Levee District v. Coast Quality Construction Corp., 93-1718 (La.5/23/94), 640 So.2d 1258, 1273, cert. denied, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995).
The parties in this case dispute what the "highest and best use" of the property was at the time of the takings. The Levee District asserts that the property was undevelopable wetlands, whereas SCAL argues that the property could have been used for residential and commercial development.
When a permit is necessary for the development of land in order for the land to be put to its highest and best use, the landowner bears the burden of proving that there is a reasonable probability of obtaining the permits necessary for development in the reasonably foreseeable future. Id. at 1275. In the present case, wetlands permits from the DNR and the Corps would have been required to develop the property to its highest and best use. A zoning change would also have been required.
*682 Other factors used to determine the highest and best use of property are: 1) market demand; 2) proximity to areas already developed in a manner compatible with the intended use; 3) economic development in area; 4) specific plans of businesses and individuals including action already taken to develop land for that use; 5) scarcity of land available for that use; 6) negotiations with buyers interested in the property taken for a particular use; 7) absence of offers to buy the property made by buyers who would put it to the use urged; and 8) use of the property at the time of the taking. West Jefferson Levee District v. Coast Quality Construction Corp., supra at 1274.
The primary issue in this case is whether SCAL met its burden of proving by a preponderance of the evidence that the DNR and the Corps would have issued the necessary permits to allow these properties to be developed and to establish that the highest and best use of the property was residential and commercial development.
In its reasons for judgment on this issue, the trial court found that "it was reasonably probable that in the reasonably near future extending beyond these two expropriations, that the defendant, Land Company would have obtained the necessary permits from the Louisiana Department of Natural Resources and the U.S. Army Corps of Engineers for residential and/or commercial development of their approximate 307 acres of land running parallel to the North side of U.S. Highway 61 between the Interstate-310 interchange and Ormond Boulevard." The trial court also found that the highest and best use of the properties was as a residential and commercial development.
On appeal, the Levee District asserts eight assignments of error. In its first assignment of error, the Levee District argues that the trial court erred when it found that permits could have been obtained for the development of the property within the reasonably foreseeable future from the time of the expropriation. SCAL responds that the trial court's determination was correct, because the expert testimony that it presented at trial established that there was a reasonable probability that the requisite permits would have been obtained.
The experts from both sides agree that, in order to obtain the requisite permits, the main elements that the applicant must show are: 1) a public need for the proposed activity; 2) lack of alternative sites; and 3) acceptable mitigation. However, the experts disagree as to whether SCAL would have been able to meet this criteria at the time of the expropriations.
SCAL presented the testimony of expert witnesses, namely Claude Edwin Fike, IV, Bennett Oubre, George Castille, III, and Wade Ragas, in support of its position that it was reasonably probable that permits would have been obtained. The Levee District presented the testimony of expert witnesses, such as Peter Talluto and Scott Nesbit, in support of its position that permits would not have been obtained.
In his reasons for judgment, the trial judge stated:
I am more persuaded by the testimonies of the defendant Land Company's expert witnesses. I credit their testimonies on the dispositive issues in this case....
* * * * *
Regarding the permitting issue. This court is persuaded by the testimony of the defendant's expert, George Castille, that the statistical permitting data supports the conclusion that the DNR and the Corps have granted 90 percent of the wetlands permit applications in St. *683 Charles Parish. Additionally, in the entire New Orleans District, the Corps has denied less than one percent of the permit applications. Additionally, I'm convinced from the testimonies of defendant's experts, Claude Fike, Ben Oubre, and Doctor Wade Ragas, that the defendant Land Company could have demonstrated first, a public need for their proposed mixed residential/commercial development, second a lack of alternative sights [sic], and third, an acceptable mitigation plan, all of which persuades to this court that a reasonable probability existed near the time of the expropriations that DNR and the Corps would have issued the required permits for a mixed residential/commercial development project.
Once an expert is permitted to testify in his field, the trier of fact has great discretion to accept or reject the expert's opinion, which goes to the credibility of the witness. Schexnayder v. Exxon Pipeline Company, 01-1236 (La. App. 5 Cir. 3/13/02), 815 So.2d 156, 159. When findings are based on the credibility of witnesses, the manifest error standard demands great deference to the factfinder, as only the factfinder can observe the variations in demeanor and tone of voice that bear on credibility. Boren v. ABC Insurance Company, et al., 36,586 (La.App. 2 Cir. 12/11/02), 834 So.2d 1119, 1123. On appellate review, it is the reviewing court's function to determine whether the trial court's findings were manifestly erroneous or clearly wrong. Ramirez v. Girouard, 02-887 (La.App. 5 Cir. 12/30/02), 836 So.2d 549, 551; Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Ramirez v. Girouard, supra; Stobart v. State, through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993).
Our review of the entire record reveals that there was more than sufficient evidence for the trial court to conclude that there was a reasonable probability that the property would have obtained permits. With regard to the issue of public need, we note that the property is situated in a prime location on Airline Highway just after the I-310 interchange, with two miles of frontage on Airline Highway. Mr. Oubre testified that he did not believe the DOTD would have taken land next to the subject property to put a busy interchange, i.e. I-310, if future development of that area of Airline Highway was not intended. Further, Dr. Ragas testified about the increased demand for residential and commercial property in this area. He noted that there was a public need for large-scale retail development in this area, and the Airline frontage would have been attractive to a "big box" retailer, such as Wal-Mart. He also opined that part of the property could be successfully marketed as residential waterfront property. Dr. Ragas further discussed the population growth in the area, and concluded that SCAL would have been able to establish public need for a residential/commercial development at the time of the takings. Although the Levee District's experts, specifically Mr. Nesbit, testified that public need could not have been shown for a residential/commercial development, it was the trial judge's duty to determine which testimony was more credible, and he chose to believe the defendant's experts on this issue.
With regard to alternative site analysis, both Dr. Ragas and Mr. Oubre indicated that the property is unique in its location and size. Neither of these experts could identify an alternative location that was as large, for sale, and non-wet property with *684 the same potential for development as the subject property. Although the Levee District's expert, Scott Nesbit, testified that there were alternative sites at the time of the takings, the property that he found was not as large or located in such a prime location as the subject property. With regard to mitigation, Mr. Fike testified that mitigation would not have been a problem in 1991 or 1994. He stated that mitigation was inexpensive at that time and that there was property that would have been available for mitigation.
Each side presented expert testimony in support of its position and the trial judge had to make credibility determinations when assessing the testimony of these experts. The trial court found that there was a reasonable probability that SCAL could have obtained the requisite permits to develop the property at the time of the takings. Considering the testimony and evidence in this matter, we cannot say that this finding is clearly wrong or manifestly erroneous. Accordingly, this assignment of error is without merit.
In its second assignment of error, the Levee District asserts that the trial court committed manifest error by relying on the testimony of Dr. George Castille when determining the likelihood of permitting. It contends that Dr. Castille's testimony regarding general statistics is not indicative of the likelihood of permitting on a particular site. It further argues that his testimony regarding a handful of permits granted on properties incomparable in location, size, and nature to the subject property is not probative.
At trial, Dr. Castille was accepted as an expert in historical geography and navigability of waterways. It is undisputed that Dr. Castille did not claim to be an expert in permitting. Rather, he testified about the probability of obtaining a permit based only on historical trends and projections for the subject property. In its reasons for judgment, the trial court stated:
This court is persuaded by the testimony of the defendant's expert, George Castille, that the statistical permitting data supports the conclusion that the DNR and the Corps have granted 90% of the wetlands permit applications in St. Charles Parish.
This statement by the trial judge does not indicate that he relied solely on Dr. Castille's statistical information when determining that there was a reasonable probability that the property would have received permits. Rather, it simply indicates that he believed Dr. Castille's findings that 90% of DNR and Corps permit applications were granted during the pertinent time period. In fact, the trial judge went on to explain that the testimony of Mr. Fike, Mr. Oubre, and Dr. Ragas convinced him that SCAL could have established the requisite elements in order to receive permits.
Several witnesses testified that it became more difficult to obtain a permit in the 1990's than in the 1980's. The statistical information presented by Dr. Castille established that a high percent of permit applications were granted in the early 1990's, even though it was apparently more difficult to obtain them. Although it is true that permits are considered on a case-by-case basis and that statistics are not conclusive as to whether a specific piece of property will be permitted, statistics regarding the percentage of permits that are granted gives some indication of the difficulty in obtaining a permit, and this is certainly a factor that may be considered when determining whether the subject property would have received permits.
The Levee District argues that some of the permits discussed by Dr. Castille were on property of different size, location, and *685 nature than the subject property. While there are indeed differences in the properties discussed, this was noted during cross-examination of Dr. Castille, and the trial judge was aware of these differences when he decided how much weight to give Dr. Castille's testimony. Further, the Levee District did not establish that the permitting statistics were not the same for property similar to the subject property. Regardless of the differences in the properties, the overall percentage of properties that received permits in 1991 and 1994 was a factor that the trial court was allowed to consider.
The effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Lanasa v. Harrison, 02-26 (La.App. 4 Cir. 8/7/02), 828 So.2d 602, 605, writ denied, 02-2512 (La.11/27/02), 831 So.2d 286. We find no error in the trial court's consideration of Dr. Castille's testimony when making his determination regarding the likelihood of permitting. Accordingly, this assignment of error is without merit.
In its third assignment of error, the Levee District contends that the trial court committed manifest error by heavily weighing the testimony of SCAL's experts, Ben Oubre and Dr. Wade Ragas. The Levee District notes the following language in the trial judge's reasons for judgment:
I'm convinced from the testimonies of defendant's experts Claude Fike, Ben Oubre, and Dr. Wade Ragas, that the defendant Land Company could have demonstrated first, a public need for their proposed mixed residential/commercial development....
The Levee District argues that the trial court should not have relied on the testimony of Dr. Ragas and Mr. Oubre regarding the likelihood of permitting, because these witnesses were not accepted as experts in permitting. Mr. Oubre was accepted as an expert in real estate appraisal, and Dr. Ragas was accepted as an expert in market analysis, real estate appraisal, financial feasibility, and the 404 permit application process for needs assessments. Although these witnesses were not tendered or accepted as experts in permitting, their areas of expertise are certainly related and relevant to the issue of permitting. First, Dr. Ragas was qualified in the 404 permit application process for needs assessment. Public need for the proposed activity is a fundamental element required to obtain a permit. Further, both experts' expertise in real estate appraisal, particularly in St. Charles Parish, qualified them to testify about alternative sites in the area, which is the second vital element required before a permit will be issued.
As stated above, the effect and weight to be given to expert testimony is within the broad discretion of the trial judge. Lanasa v. Harrison, supra. We find no error in the trial court's consideration or reliance on the testimony of Dr. Ragas and Mr. Oubre when determining the likelihood of permitting in this case. Accordingly, this assignment of error is without merit.
In its fourth assignment of error, the Levee District argues that the trial court committed manifest error when it determined the highest and best use of the property was commercial and residential development, because SCAL did not meet its burden of proving the likelihood of permitting. The Levee District states that "[i]f this court finds that the trial court erred in finding that the Land Company met its burden of proving that the property would be permitted, then this court must also find that the trial court erred in its finding regarding the highest and best use of the property."
*686 Considering our determination that the trial court did not err in finding a reasonable probability that the land would be permitted, we also conclude that the trial court did not err in finding that the highest and best use to which SCAL could have utilized the property was for residential and commercial development. Accordingly, this assignment of error is without merit.
In its fifth assignment of error, the Levee District argues that the trial court committed manifest error in the calculation of the valuation of the construction servitude and in the award of severance damages. The Levee District asserts, "[i]n the event that this Honorable Court should find that the Land Company did not meet their burden of proving that the highest and best use for the subject property is mixed commercial/residential, then this Court should also find that the Court erred in awarding severance damages and its calculation of the award for the construction servitude." Considering our previous determinations that the trial court did not err in determining that there was a reasonable probability that SCAL would have obtained permits for the property and that the highest and best use of the property was residential/commercial development, there is nothing for us to review in this assignment of error.
In its sixth assignment of error, the Levee District argues that the trial court committed legal error when it awarded attorney's fees as a percentage of the aggregate of the excess compensation awarded and judicial interest accrued. It asserts that the statute providing for an award of attorney fees in expropriation cases does not specifically provide that the award be calculated on the aggregate of the excess award and the judicial interest accrued thereon.
After a hearing on SCAL's Motion for Determination of Attorney Fees, Expert Fees, and Costs, the trial court issued a judgment awarding attorney fees to SCAL in an amount equal to ten percent of all additional just compensation and interest awarded to SCAL after trial on the merits.
LSA-R.S. 38:387(E) provides:
Reasonable attorney's fees may be awarded by the court if the amount of the compensation deposited in the registry of the court is less than the amount of compensation awarded in the judgment. Such attorney's fees in no event shall exceed twenty-five percent of the difference between the award and the amount deposited into the registry of the court.
The Levee District argues that there is no language in the statute that reveals an intent by the legislature to allow an aggregation of the excess award and the interest accrued as a basis for the calculation of attorney fees. However, LSA-R.S. 38:387(E) does not indicate that the award may not be based on excess compensation plus interest.
The award of attorney fees in this case was ten percent of the excess compensation awarded plus interest. Even including the interest on the excess compensation awarded, the total award of attorney fees does not exceed 25% of the excess compensation award. Therefore, there is no doubt that the award of attorney fees in this case does not exceed the statutory cap, regardless of whether interest should be included in such an award or not. Accordingly, this assignment of error is without merit.
In its seventh assignment of error, the Levee District argues that the trial court committed manifest error when it awarded excessive attorney fees to SCAL. In its cross-appeal, SCAL argues that the trial court erred in awarding attorney fees of *687 only 10% of the excess compensation plus interest, because the evidence it presented showed that it should have received at least 18% of the amount of excess compensation plus interest.
An award of attorney fees in expropriation cases is largely within the trial court's discretion, and a reviewing court will not disturb such an award absent an abuse of that discretion. State, DOTD v. Williamson, 91-2401, 91-2404 (La.4/20/92), 597 So.2d 439, 442. In State, DOTD v. Williamson, the Louisiana Supreme Court used the following factors when reviewing the award of attorney fees: 1) the ultimate result obtained; 2) the responsibility incurred; 3) the importance of the litigation; 4) the amount of money involved; 5) extent and character of the work performed; 6) legal knowledge, attainment, and skill of the attorneys; 7) number of appearances made; 8) intricacies of the facts involved; 9) diligence and skill of counsel; and 10) the court's own knowledge.
At the hearing on the Motion for Determination of Attorney Fees, Expert Fees, and Costs, SCAL presented the testimony of David Stone, who was accepted as an expert regarding attorney fees in expropriation matters. Mr. Stone discussed the factors set forth in State, DOTD v. Williamson and applied these factors to this case. Both Mr. Stone's testimony and the record before us reveal that SCAL was not awarded excessive attorney fees. This case involved complicated issues that were strongly contested by the Levee District. The SCAL attorneys prevailed in this case and received a substantial amount of compensation in excess of the amount originally deposited in the registry of the court by the Levee District. The attorneys for SCAL made several court appearances, undertook a great deal of preparation for the trial, and the trial lasted four days.
The trial court has great discretion in setting attorney fees. State, DOTD v. Williamson, supra at 441. Considering the testimony and evidence in this matter, as well as the Williamson factors, we find that the award of attorney fees in this case was reasonable. Therefore, we find that it was neither excessive nor insufficient. Accordingly, the Levee District's seventh assignment of error and SCAL's cross-appeal are both without merit.
In its eight and final assignment of error, the Levee District argues that the trial court committed manifest error when it awarded unreasonable expert fees. In its judgment on the Motion for Attorney Fees, Expert Fees, and Costs, the trial court awarded SCAL reimbursement of its expert fees as follows: $43,924.39 total for both Bennett Oubre and Mike Dixon; $44,330.00 for Dr. Wade Ragas; and $63,181.40 total for both Dr. George Castille and Claude Edwin Fike.
The Levee District argues that SCAL did not present any evidence in support of its request for expert fees, other than invoices and expert reports, and this documentation does not establish that the expert fees were reasonable. It further argues that a jury trial involving expropriation of property near the property in this case was held before the same trial court shortly before this trial, namely State of Louisiana, Pontchartrain Levee District v. Charles Ostarly, Jr., et al., and Dr. Ragas and Dr. Castille submitted reports in that case that were similar to their reports in this case. The Levee District asserts that the expert fees for these two experts were substantially higher in the present case, but they should have been less because much of the groundwork for this case was prepared in Ostarly. The Levee District *688 specifically contests the expert fees awarded to Dr. Ragas and Dr. Castille, because Mr. Oubre, Mr. Dixon, and Mr. Fike were not experts in the Ostarly case. SCAL responds that the expert fees in the Ostarly case were awarded via a consent judgment, and therefore, the fees awarded in that case are irrelevant.
When a landowner retains expert witnesses to assist him in obtaining his just compensation in expropriation matters, the condemning authority is to be taxed with reasonable expert witness fees. Natchitoches Parish Port Commission v. Deblieux & Kelley, Inc., 99-313, 99-314, 99-315 (La.App. 3 Cir. 3/22/00), 760 So.2d 393, 410, writ denied, 00-1121 (La.6/2/00), 763 So.2d 601. The fixing of expert fees is within the trial court's discretion, and such an award will not be disturbed absent an abuse of discretion. Id. In Natchitoches Parish Port Commission, the Court set forth the following factors for a trial court to consider when setting expert witness fees: 1) the amount of time consumed by the experts in compiling their reports; 2) the amount charged to the landowner; 3) the amount of time spent in preparing for trial; 4) the amount of time spent in court; 5) the expert's expertise; 6) the difficulty of the expert's work; 7) the amount of the award; and 8) the degree to which the expert witnesses' opinion aided the courting its decision.
Regardless of the expert fees awarded in another case, we have reviewed the factors set forth in Natchitoches Port Commission and applied them to the instant case. The invoices and reports of the experts in this matter show that SCAL's experts spent a great deal of time preparing their reports, preparing for trial, and testifying at trial in this case.[2] The testimony in this matter consisted almost solely of expert testimony, and the issues involved in this matter were detailed and complex. Therefore, the expert opinions were undoubtedly very helpful to the trial judge in arriving at his decision.
Considering the testimony, the evidence, and the pertinent law, we find that the amount of expert fees awarded did not constitute an abuse of the trial court's discretion.

DECREE
For the reasons set forth above, we affirm the trial court's judgment on the trial on the merits, dated March 11, 2003, and the judgment on the Motion for Attorney Fees, Expert Fees, and Costs, dated September 25, 2003.
AFFIRMED.
NOTES
[1] The Levee District filed two additional petitions for expropriation, on January 13, 2000 and August 6, 2002, but these petitions are not at issue in this appeal.
[2] Mike Dixon did not testify in court during the trial.