MARION F. EDWARDS, Judge.
 

 | gDefendants/appellants, APMT, Inc. and Five Properties, Inc. (“APMT”), appeal a judgment of the Twenty-Fourth Judicial District Court in favor of plaintiffs/appel-lees, Thomas and Jennifer Middleman, Linda Shubert, Robert McNair, Tome’ Frazier, Derrick Chocklin, and Robert Ybarzabal (collectively, “tenants”), awarding them damages suffered as the result of a fire that occurred at defendants/appellants’ apartment complex.
 

 On June 3, 2005, a fire damaged the twenty-four unit apartment building known as Windsong Apartments in Ken-ner, Louisiana. It was alleged that the fire originated in a part of the building inaccessible to residents and caused the loss of the tenants’ home contents, as well as physical injuries and mental and emotional distress. Following a trial, the court found that the fire was not the fault of one of pthe tenants but, rather, was the result of an electrical failure in the building’s wiring. Damages were awarded as follows:
 

 Jennifer Middleman $25,630.00
 

 Thomas Middleman $25,330.00
 

 Linda Shubert $57,573.55
 

 Derrick Chocklin $34,337.00
 

 Tome’ Frazier $30,462.00
 

 Rose McNair $32,177.00
 

 Robert Ybarzabal $18,830.00
 

 The awards included general as well as pecuniary damages. Pursuant to a Motion for New Trial, the court awarded damages to the Middlemans as administrators of the estate of their minor child, Emma.
 

 On appeal, APMT alleges that the trial court erred in imposing liability because the tenants failed to prove the existence of a defect in the premises and that the defect caused their damages; in refusing to enforce the tenants’ contractual assumptions of liability and waiver of warranty set forth in them respective leases; and in awarding excessive and unsupported damages.
 

 At trial, Melvin Stringer (“Mr. Stringer”) testified as an expert witness in the field of fire cause and origin. Mr. Stringer was contacted by State Farm Insurance Company (“State Farm”), which insured some of the tenants, to investigate the fire. Mr. Stringer did not visit the scene until some seventeen days after the fire, as there were two other investigators representing other parties and protocol demanded all go at the same time. On examining the property, Mr. Stringer found there were no fire partitions (which inhibit the spread of fires) in the building’s attic and no interior firewalls within the building. In his opinion, the fire originated on the third floor, in or above the HVAC (heat, ventilation, and air-conditioning) enclosure of Apartment U, or in the immediate attic vicinity. The wiring was aluminum and melted, so the specific location of the short in the wiring could not be determined. Nothing had been stored in the HVAC enclosure, which is taken up virtually |,, entirely by the HVAC unit, and there was no evidence the fire had been caused by the tenant. An examination of the HVAC unit revealed no evidence that it had failed, and Mr. Stringer concluded it was not involved in the ignition of the fire. The only reasonable explanation for the fire was an unspecified electrical failure in the building’s electrical system. Mr.
 
 *981
 
 Stringer’s report was admitted into evidence, wherein he concluded that the cause of the fire was the ignition of combustibles from an unspecified electrical failure in the building’s wiring. Mr. Stringer testified that an “unspecified electrical failure” did not mean that he could not figure anything else out but that he had eliminated all other reasonable causes.
 

 Linda Shubert (“Ms. Shubert”) testified that, at the time of the fire, her two godchildren lived with her. On that day, she saw smoke in the living room and took the children outside. After watching her home burn, she was devastated and experienced emotional distress. She had previously been treated for emotional problems as the result of a back injury at work, but the fire worsened her symptoms. Prior to the fire, she was able to continue her job at the post office, but, afterwards, missed several weeks of work. Ms. Shubert described certain emotional traumas that she had experienced prior to the fire, as well as surgeries due to injuries received in accidents. She had experienced stress as a result of her employment injury and became depressed. She had also experienced other physical problems requiring medication. Following the fire, she experienced increased insomnia and nervousness, and her previous pain worsened, causing more depression. Her back pain increased as a result of having to get the children out during the fire and having to move things around in the apartment af-terwards. Subsequently, she left the post office on disability. When she was allowed to see her apartment, she became ill from the smoke and soot odors. Ms. Shubert testified that her bedroom furniture appeared fine except for the mattress and, | ¿following Hurricane Katrina, she was told by a maintenance worker that her bedroom furniture had been salvaged after the fire. She lost many items of sentimental value. Of her belongings, she was only able to rescue two tables.
 

 Rose McNair (“Ms. McNair”) testified that the first indication of a problem on the morning of the fire was a policeman knocking on her door; although she had a smoke detector, she did not hear it that day. She missed two days of work. She returned to the apartment a couple of weeks after the fire but could only salvage a few clothes, which she could not use again because the odor could not be removed.
 

 After the fire, she was very depressed, as it added to problems she was having with her mother’s health. She was already having financial difficulties because she was helping her parents financially. She still suffers nervousness and insomnia, although she testified that she has had a history of insomnia because of her work stress and long hours. However, after the fire, she would actually jump in her sleep. Ms. McNair received $6,163 from her renters’ insurance policy that had a deductible of $250.
 

 Derrick Chocklin (“Mr. Chocklin”) testified that, at the time of the fire, he had work uniforms, steel toe boots, and some tools that were lost. He lost one week of work. His cousin, Tome’ Frazier, with whom he lived, woke him up that morning. Smoke was coming out of the vents in the bedroom, bathroom, and kitchen. Fire began rolling out of the bathroom vent. After attempting to put out the fire with an extinguisher, Mr. Chocklin and Tome’ Frazier left the apartment. The smoke alarm did not go off. He was not able to recover anything, although the fire was mostly contained in the bedroom. About one week after the fire, he returned and the place was empty. Mr. Chocklin told someone in the office that he had seen things from his apartment, which had not burned, on some workers’ trucks. The management let the workers come through the building unsupervised. |i;Mr. Chocklin lost
 
 *982
 
 irreplaceable family mementoes, including jewelry. He felt “hollow” and “bad” about losing his things, and had a weak stomach for about six months.
 

 Jennifer Middleman (“Ms. Middleman”) testified that, at the time of the fire, she had gone to work. She had two children ages six and sixteen months. Her husband phoned and told her about the fire, saying that he did not think their apartment would burn. By the time she returned home, the fire had spread to their apartment. Once she ascertained that her family was safe, they gathered in the family car and began to cry. Ms. Middleman had many items of sentimental value that were lost, as well as a bag of jewelry. One of the workers took her camcorder. She missed one week of work. The family had to borrow furniture, which they have not been able to replace. Ms. Middleman received a Red Cross voucher in the sum of $150 for the family, and they received $35,266.51 from their rental insurer; however, they returned $8,500 that had been an overpayment. She remains fearful and still has sleepless nights, with some anxiety and depression. Her daughter also became fearful, especially of the smell of smoke or other unusual odors, and worries about her belongings, all of which were lost in the fire. She would pile her toys up near the door in case she had to run out again.
 

 Thomas Middleman (“Mr. Middleman”) testified that he was home with the children when the fire broke out. He could not find the source of the smell of smoke, but someone knocked on his door telling him of the fire. His daughter, Emma, ran out of the building. Mr. Middleman got dressed and took his son out. Watching the fire he was shocked, then saddened. He has episodes of crying and depression, and missed two or three days of work. Emma is very worried and anxious.
 

 17Robert Ybarzabal, Jr. (“Mr. Ybarza-bal”) testified that, at the time of the fire, he lived in another building in the complex while his father was a tenant in the unit that caught fire. His father, who has since passed away, was 85 years old and was sitting in his unit when his son came to get him. There was smoke in the apartment, but he didn’t realize he was in danger. After the fire, when he saw what was left of his home, the elder Mr. Ybarzabal began to cry. The contents were a total loss. Mr. Ybarzabal became nervous and jittery and was unable to sleep, which was unusual for him. He became irritable and seldom left his home, which was also uncommon for him. On one occasion, the elder Mr. Ybarzabal heard sirens and called his son, telling him there was a fire in his apartment. There was no fire.
 

 Tome’ Frazier (“Ms. Frazier”) lived with her cousin, Mr. Chocklin. On the morning of the fire, she heard crackling coming from one of the vents in the bathroom, and, though there was smoke in the apartment, the smoke alarm did not go off. She lost family heirloom furniture and plaques belonging to her late father, as well as letters and jewelry. She was not able to salvage anything. Neither she nor her cousin smoked cigarettes, and there was nothing stored in the HVAC closet. It has been a constant struggle to rebuild her life and is an overwhelming process. She saw some of the workers stealing things from the apartments. She has not sought counseling for any emotional symptoms and missed two to three weeks of work. She received $11,113 from State Farm for personal property insurance.
 

 In each claim, State Farm pursued its subrogation rights in its own consolidated action.
 

 George Hero (“Mr. Hero”) investigated the fire for APMT, owner of Windsong. He determined that the area of origin was the HVAC closet in Apartment U, at floor
 
 *983
 
 level. There is no low electrical wiring. It is not unusual for Rpeople to store things there, so Mr. Hero opined that the cause of the fire was due to some material stored there or there was some other accidental cause by the occupant. However, there was no evidence of any stored material. The possibilities are tenant action, mechanical problems with the ah* conditioning unit, or electrical defects. He did not find any defects or sources of ignition in the electrical system or the appliances.
 

 Sam Smith (“Mr. Smith”), a carpenter and roofer for APMT, worked after the fire at Windsong to board up windows and doors. When allowed, the workers would escort people to their apartments to get their belongings. Ms. Shubert collected her television set, baby clothes, and some photos. She gave him her bed. The bed remained in storage at Windsong for sixty days. It is company policy to have a written document when a tenant gives them some things, but Mr. Smith did not see such a paper.
 

 Suzanne Tonti (“Ms. Tonti”) is a manager at APMT (referred to as “Tonti”) Properties. When a tenant signs a lease, the agents answer any specific questions posed by the lessees. The leases are initialed on each page. After the fire, the management helped the tenants determine their housing options. All but one, the Middle-mans, relocated to a Tonti property. The company could only release a burned unit for inspection and retrieval by the former tenants once it was determined to be safe and released by the insurance company. Tonti employees are not allowed to accept property from tenants and any such transaction must be run through management. There is no written document for this. However, Tonti does have documentation, from statements of two employees, that Ms. Shubert gave permission to take her bed. In the leases, there is a clause that if there is any problem in the premises, meaning the apartment unit, it is the obligation of the tenant to inform management.
 

 IflDr. Harminder Mallik (“Dr. Mallik”) did a psychiatric evaluation of Ms. Shubert for APMT regarding her claim of post-traumatic stress disorder (“PTSD”). After examining her medical records, he found that Ms. Shubert had a history of depression and anxiety disorders, as well as of insomnia, both before and after the fire. There was no documentation in her prior history that she ever related any of her symptoms to the fire. Dr. Mallik’s interview took place fifteen months after the fire, and he opined that incidents in Ms. Shubert’s personal history, as well as her work history, greatly impacted her before the fire. She did not relate information that indicated PTSD. Rather, according to Dr. Mallik, she described “mental anguish” as anger toward the management because she was not allowed back into her apartment to determine her losses and that employees had taken her property, and that she had been singled out by the management. According to Dr. Mallik, the fire did not significantly change her mental state, although he had no documentation or information about her around the time of the incident — she had not had treatment from 2003 until 2006. Dr. Mallik stated that Ms. Shubert had suffered a trauma but that it did not rise to the level of PTSD.
 

 In its Reasons for Judgment finding liability on the part of APMT, the trial court stated it had previously denied summary judgment based on Mr. Hero’s report that no defects or sources of ignition could be found in the electrical system, and he could not exclude “some actions by a tenant” as a source of ignition. The court went on to note that at trial. Mr. Hero admitted there was no actual evidence that any material was stored in the HVAC closet by a tenant. The court then consid
 
 *984
 
 ered the testimony of Mr. Chocklin and Ms. Frazier that they did not store anything in the closet, and the testimony and report of Mr. Stringer that the fire was caused by ignition of combustible building materials from an electrical failure in the building’s wiring.
 

 1 mThe court also found that the liability waivers contained in the leases concerned only the “leased premises” and that the defect was not found within the actual apartment of any plaintiff but, rather, “in the service compartment leading to the attic space of the building.”
 

 Former La. C.C. art. 2695 was revised and its principles codified in La. C.C. arts. 2696 and 2697. La. C.C. art. 2696 states that the lessor warrants the lessee that the thing is suitable for the purpose for which it was leased and that it is free of vices or defects that prevent its use for that purpose. This warranty also extends to vices or defects that arise after the delivery of the thing and are not attributable to the fault of the lessee. Under La. C.C. art. 2697, this warranty encompasses vices or defects that are not known to the lessor. Of the burden of proof in these cases, we have stated:
 

 To recover under [former] Art. 2695, it is not necessary to prove the cause of the defect. - A lessee must prove only the existence of the defect. In order for a lessee to recover damages from the lessor under this article due to an alleged vice or defect in the leased premises, the lessee must prove by a preponderance of the evidence that a defect existed in the premises and that the defect caused the damages. Proof by direct or circumstantial evidence is sufficient to constitute a preponderance if, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not. Causation may be proved by circumstantial evidence, and that evidence need not negate all possible other causes, but it must exclude other reasonable hypotheses with a fair amount of certainty.
 
 [1]
 

 The effect and weight to be given to expert testimony is within the broad discretion of the trial judge.
 
 [2]
 
 In the present case, the trial court gave a great deal of weight to the testimony of Mr. Stringer and determined that his testimony, along |uwith that of Mr. Chocklin and Ms. Frazier, was sufficient to show a defect in the building’s wiring was the cause of the fire. Mr. Hero testified that he found no defect in either the air conditioning unit or the wiring, leaving him to conclude “tenant activity” as the cause of the fire. Mr. Stringer agreed the problem was not in the air conditioning unit but found that, due to the condition of the building, while the location of the particular failure remained unspecified, it was in the building’s electrical system. Granting credence to the testimony of Mr. Chocklin and Ms. Frazier that nothing was stored in the closet, the court concluded a defect existed in the wiring. Based on the evidence presented, we cannot find that that this determination was clearly wrong.
 

 APMT directs us to cases which hold that the occurrence of an accident or fire on leased premises does not give rise to a presumption that a defect in the premises caused the accident or fire.
 
 [3]
 
 The principle
 
 *985
 
 remains true, but those cases are inapplicable on their facts. In
 
 Latham,
 
 the case was submitted on a stipulation of facts.
 
 [4]
 
 The Louisiana Supreme Court found that the stipulation did not justify a finding of a defect in the electrical system, because there was no evidence as to the cause of the fire. In that case, the only reference to a possible cause was the alarm report of the fire department, which said, “ ‘Where fire started and cause is unknown for sure. It appears cause may have been an electrical failure of some kind in the area of apartment ... 201 or 203 or attic over one or the other, (see statement of tenant 201 on back of report.)’ ”
 
 [5]
 
 The court noted that the plaintiff was the tenant in 201 and the statement to which the alarm report referred related only what plaintiff saw as set forth in the stipulation. There was no definitive finding of cause. Similarly, in
 
 Long,
 
 the expert testified that he “was not certain as 112to the cause, but if he had to make a decision, he would say the origin was electrical but he could not be positive on this score.”
 
 [6]
 
 In the present case, the fire was investigated by two experts who testified and filed written reports. Mr. Stringer’s investigation and findings provided a basis for a finding of a defect in the electrical wiring as the cause of the fire.
 

 APMT also urges that, in the leases, the tenants assumed liability via the following clause in their leases:
 

 Lessor will not be responsible for damage caused by leaks in the roof, by bursting of pipes resulting from a freeze or otherwise, fire, theft, flooding, smoke damage, vandalism, water escape from toilets or water heaters or otherwise, or any vices or defects of the leased property or the consequences thereof, except in the case of positive neglect or failure to take action toward the remedying of such defects and the damage caused thereby....
 

 In accordance with the provisions of Louisiana Revised Statute 9:3221, Lessee does hereby agree and stipulate that he will assume responsibility for defects of the leased premises which include, but are not limited by, the apartment interior, balconies, porches, stairways, common areas, common accessories, adjacent premises, the roof and ceiling and other such areas. By this proviso, Lessee agrees and stipulates that Lessor and its agents shall not be liable for any injury caused by any defect on the leased premises as described herein-above, to Lessee, his employees, patrons, invitees, and visitors.
 

 APMT argues that the trial court erred in refusing to enforce each tenant’s individual assumption of liability and waiver of warranties as set forth in the lease. Under La. C.C. art. 2699, the warranties owed by a lessor for vices or defects, as defined in C.C. arts. 2696-2698, may be waived, but only by clear and unambiguous language that is brought to the attention of the lessee. Nevertheless, the article states that such waiver is ineffective to the extent it pertains to vices or defects of which the lessee did not know and the lessor knew or should have 113known; to the extent it is contrary to the provisions of Article 2004; or in a
 
 residential
 
 or consumer lease, to the extent it purports to waive the warranty for vices or defects that seriously affect health or safety. To be effective, a waiver must meet the conditions specified in the first paragraph of the article and must not fall within any one of the three exceptions or prohibitions. To the extent that a waiver purports to en
 
 *986
 
 compass those vices or defects that seriously affect health or safety, the waiver is ineffective. We think it obvious that a waiver of a defect in the building’s electrical system that results in a fire clearly affects health and safety and is, thus, not enforceable.
 

 APMT also refers us to La. R.S. 9:3221, which states:
 

 Notwithstanding the provisions of Louisiana Civil Code Article 2699, the owner of premises leased under a contract whereby the lessee assumes responsibility for them condition is not liable for injury caused by any defect therein to the lessee or anyone on the premises who derives his right to be thereon from the lessee, unless the owner knew or should have known of the defect or had received notice thereof and failed to remedy it within a reasonable time.
 

 We note initially that, insofar as the clause purports to waive liability for defects in common areas or common accessories, it is inapplicable. Landlords are not entitled to claim the exculpatory benefits of La. R.S. 9:3221 for such areas.
 
 [7]
 
 The rationale for this conclusion is that no single, individual tenant normally assumes exclusive responsibility for the care and maintenance of common areas.
 
 [8]
 
 Nevertheless, APMT avers that the HVAC closet and, by implication, the building wiring, was part of the leased premises (of Mr. Chocklin and Ms. Frazier) because it was in the air conditioning closet of Apartment U.
 

 In this situation, the only area which a tenant
 
 may conceivably
 
 have some control is the HVAC unit itself, and there was no evidence that it failed. Further, 1H there is no evidence that any action of any tenant caused the wiring to fail. It is unreasonable to conclude that any single, individual tenant assumes exclusive responsibility for the care and maintenance of the main electrical wiring that services a building of twenty-four apartments. We hold that, in such cases, the wiring is not included in the “leased premises” for purposes of La. R.S. 9:3221. On this issue, the tenants in the present case did not waive the lessor’s warranties expressed in La. C.C. art. 2696.
 

 We now turn to the damages awarded by the trial court. Each tenant submitted a list of estimated property damage losses. The court awarded these losses, as well as damages for mental anguish and, in some cases, lost income. The awards for Mr. Frazier, Ms. McNair, and the Middlemans were reduced by the amount of the insurance payments received.
 

 APMT avers that the tenants did not prove mental anguish sufficient to support an award of general damages, i.e., mental anguish, and that these damages were excessive. APMT urges that the tenants were in no immediate danger as they exited their units at the time of the fire and, although they stood across the street, none actually witnessed their possessions engulfed in flames.
 

 In analyzing and awarding damages, the trial court relied on
 
 Broome v.
 
 Gauthier
 
 [9]
 
 to determine that the tenants were entitled to damages.
 

 An award for mental anguish allegedly resulting from property damage is permissible only when the property is damaged by (1) an intentional or illegal act; (2) by an act for which the tortfeasor will be strictly or absolutely liable; (3) by acts constituting nuisance; or (4) when the owner is present or nearby and suffers
 
 *987
 
 1ir,psychic trauma as a result.
 
 [10]
 
 APMT is liable to the tenants under La. C.C. art. 2696, which retains the concept of strict liability.
 
 [11]
 
 Since we have found that the evidence supports a finding that the tenants suffered property damage and that APMT is strictly liable for that damage, general damages, which includes mental anguish, may be awarded. Mental anguish” or “emotional distress” is defined as “a highly unpleasant mental reaction (such as anguish, grief, fright, humiliation, or fury) that results from another person’s conduct; emotional pain and suffering.”
 
 [12]
 
 Psychic trauma is in the nature of or similar to a physical injury.
 
 [13]
 
 To be compen-sable in the present situation, mental anguish need not rise to the level of psychic trauma.
 

 General damages are those which may not be fixed with pecuniary exactitude; instead, they “involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms.” ... Vast discretion is accorded the trier of fact in fixing general damage awards.... This vast discretion is such that an appellate court should rarely disturb an award of general damages.... Thus, the role of the appellate court in reviewing general damage awards is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact....
 

 Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award....
 

 The initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages.... Only after a determination that the trier of fact has abused its “much 11fidiscretion” is a resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion....
 
 [14]
 

 With these principles in mind, we now review the general damage awards granted by the trial court.
 

 The court awarded Ms. Shubert $25,000 for mental anguish. Dr. Mallik agreed that she did suffer a trauma from the fire. After our review, detailed above, of her testimony as to her losses, experiences, and emotional suffering, including apparent aggravation of her emotional symptoms, we find no abuse of discretion.
 

 Jennifer and Thomas Middleman were each awarded $25,000 for mental anguish. Considering their testimony re
 
 *988
 
 garding their fear, loss of family items, including possible theft by APMT employees, worry for their children, and lingering anxiety and depression, we do not find these awards to be excessive. Emma Middleman was awarded $5,000. We find the evidence supports such an award, especially considering her lingering fears and worries, as well as her tender age.
 

 Ms. Frazier was awarded $20,000 for mental anguish. She also lost family heirloom, furniture, memorabilia of her late father, and family jewelry. Further, it was in her apartment that the fire had the initial impact, with smoke and flames coming from the air vents. She found rebuilding her life to be overwhelming. We find this award is not excessive.
 

 Mr. Chocklin received an award of $15,000. He lived with Ms. Frazier, and also witnessed possible theft of his things, as well as irreplaceable family mementoes, including jewelry. He suffered lingering physical symptoms. This item of damages is not excessive.
 

 117Mr. Ybarzabal experienced loss of enjoyment of life, insomnia, fear and anxiety, and a change in personality. An award of $15,000 was reasonably within the trial court’s discretion.
 

 The court awarded Ms. McNair $20,000 for mental anguish. The evidence in this case is somewhat less compelling. Ms. McNair described an increase in depression, and there is some evidence that the fire exacerbated her emotional problems and her insomnia. While the award is rather high, we feel that the trial court was in a better position to assess the effects of the particular injury to this particular plaintiff under the particular circumstances and cannot say that it is so unreasonable so as to constitute an abuse of the trial court’s vast discretion.
 

 APMT also urges the court erred in awarding damages for lost wages to the Middlemans, Mr. Frazier, and Mr. Chocklin. The only evidence on this issue was the testimony of the witnesses themselves.
 

 Under Louisiana jurisprudence, wage losses may be established by any proof which reasonably establishes the claim, including the plaintiffs own reasonable testimony.... While claims for past lost wages must be established with some degree of certainty, ... they need not be proven with mathematical certainty, but only by such proof as reasonably establishes the plaintiffs claim.... This award may be supported by the plaintiffs detailed and uncorroborated testimony. ...
 
 [15]
 

 The plaintiffs uncorroborated, self-serving testimony will not be sufficient to support an award if it is shown that corroborative evidence was available and was not produced.
 
 [16]
 
 In the case before us, the tenants testified as to their lost income, by stating their hourly or weekly wages and the amount of time lost due to the fire. There was no showing that any corroborative evidence was available and 11sthat the tenants failed to produce it. Therefore, we find the court properly awarded damages for lost wages to those tenants.
 

 For the foregoing reasons, the judgment of the trial court is affirmed. APMT is assessed all costs of appeal.
 

 AFFIRMED.
 

 [1]
 

 .
 
 Montecino v. Bunge Carp., Inc.,
 
 04-875 (La.App. 5 Cir. 2/15/05), 895 So.2d 603, 607,
 
 writ denied,
 
 05-0962 (La.6/17/05) 904 So.2d 704 (footnotes omitted).
 

 [2]
 

 .
 
 State v. St. Charles Airline Lands, Inc.,
 
 03-1292 (La.App. 5 Cir. 4/27/04), 871 So.2d 674,
 
 writ denied,
 
 04-1552 (La.10/1/04) 883 So.2d 992.
 

 [3]
 

 .Latham v. Aetna Cas. & Sur. Co.,
 
 377 So.2d 350 (La.1979);
 
 See also, Long v. McMichael,
 
 219 So.2d 810 (La.App. 1 Cir. 1968).
 

 [4]
 

 .
 
 Latham, supra.
 

 [5]
 

 .
 
 Id.
 
 at 352.
 

 [6]
 

 .Long, supra,
 
 at 813.
 

 [7]
 

 .
 
 Dorion v. Eleven Eleven Bldg.,
 
 98-3018 (La.App. 4 Cir. 5/12/99), 737 So.2d 878.
 

 [8]
 

 .
 
 Id.
 

 [9]
 

 . 443 So.2d 1127 (La.App. 4 Cir.1983),
 
 writ denied,
 
 445 So.2d 449 (La.1984).
 

 [10]
 

 .
 
 Williams v. City of Baton Rouge,
 
 98-1981 (La.4/13/99), 731 So.2d 240;
 
 1900 Partnership v. Bubber, Inc.,
 
 27,475 (La.App. 2 Cir. 11/1/95), 662 So.2d 808,
 
 writ denied,
 
 96-0037 (La.2/28/96), 668 So.2d 369;
 
 Freyou v. Iberia Parish Sch. Bd.,
 
 94-1371 (La.App. 3 Cir. 5/3/95), 657 So.2d 161;
 
 Blache v. Jones,
 
 521 So.2d 530 (La.App. 4 Cir. 1988).
 

 [11]
 

 .
 
 See, Montecino v. Bunge, supra; See also, Barnes v. Riverwood Apartments P'ship,
 
 38,-331 (La.App. 2 Cir. 4/7/04), 870 So.2d 490,
 
 writ denied,
 
 04-1145 (La.6/25/04) 876 So.2d 845.
 

 [12]
 

 .
 
 Black’s Law Dictionary
 
 (8th ed.2004).
 

 [13]
 

 .
 
 See, e.g., State Farm Fire & Cas. Co. v. Torregano,
 
 00-141 (La.App. 5 Cir. 9/26/00), 769 So.2d 754.
 

 [14]
 

 .
 
 Bellard v. Am. Cent. Ins. Co.,
 
 07-1335 (La.4/18/08), 980 So.2d 654, 674 (citations omitted).
 

 [15]
 

 .
 
 Daniels v. Burridge,
 
 00-1089 (La.App. 4 Cir. 3/21/01), 785 So.2d 906, 911,
 
 writ denied,
 
 01-1110 (La.6/1/01), 793 So.2d 201 (citations omitted).
 

 [16]
 

 .
 
 Wehbe
 
 v.
 
 Waguespack,
 
 98-475 (La.App. 5 Cir. 10/28/98), 720 So.2d 1267, 1275, 1276,
 
 writ denied,
 
 98-2907, 98-2970 (La. 1/15/99), 736 So.2d 211, 213.