921 So.2d 1240 (2006)
Brenda LEE, Nettie Kirklin, Olga LeBlanc, Darnell Jackson, Lucille Baker, Molly Lewis, Beatrice Brackens, Betty Taylor Jackie Matthews, and Maxine Robinson
v.
CONSTAR, INC., Art Setty and Dennis Charbonnay.
No. 05-CA-633.
Court of Appeal of Louisiana, Fifth Circuit.
February 14, 2006.
Rehearing Denied March 14, 2006.
*1243 R. Bruce MacMurdo, Connie M. Aucoin, Baton Rouge, Louisiana, for Plaintiff/Appellant.
George D. Fagan, Kendra L. Duay, McNeil Kemmerly, Wendy L. Rovira, New Orleans, Louisiana, for Defendant/Appellee.
Panel composed of Judges JAMES L. CANNELLA, THOMAS F. DALEY, and MARION F. EDWARDS.
JAMES L. CANNELLA, Judge.
The Plaintiffs, Brenda Lee, Olga LeBlanc, Darnell Jackson, Beatrice Brackens, Jackie Matthews, Maxine Robinson, Nettie Kirklin, Lucille Baker, Molly Lewis, and Betty Taylor, appeal from a judgment dismissing their claim of gender discrimination filed against the Defendant, Constar, Inc. The Defendant appeals the denial of court costs. We affirm.
The Defendant, part of a national bottle-making business, was in operation in St. John the Baptist Parish from the 1970's until 2003, when its physical plant closed due to financial considerations. The Plaintiffs were all production workers employed as packers, an unskilled position. In the 1980's, some of the Plaintiffs had temporarily operated the palletizer or boxing machines. Prior to a policy change made in 1989, production workers could be promoted to the operator position which ran the bottle-making equipment. No special qualifications were needed, other than on-the-job training. The operator position was a higher classification job. Sometime in 1989 or 1990, the equipment began to change. Some jobs were automated and some equipment became more technologically sophisticated. The Defendant then instituted an unwritten policy of requiring a vocational-technical school certificate in order to become an equipment operator, which included the duties of operation, troubleshooting and maintaining the equipment. At a later time, experience with any type of equipment was allowed to substitute for the school certificate. For the next 10 years, no one was promoted to or hired for the operator position without one of those requirements. According to trial testimony, some or all of the Plaintiffs signed up for an operator position, but were not considered due to lack of the educational qualifications. One female person from the production line filed an *1244 application during that time, but was denied the job due to her lack of credentials. Eventually, she was hired after receiving her educational certificate. Another female worker, who had been in the operator trainee position won an Equal Employment Opportunity Commission (EEOC) decision to continue being trained and then hired as an operator after the Defendant attempted to demote her back to the packer position. None of the Plaintiffs attempted to obtain the certification needed for promotion.
Prior to 1989, some of the packers were occasionally asked to temporarily operate the equipment when it was necessary. Their involvement was to "push buttons" and release "jams." None were capable of maintaining the machines or fixing them, as needed.
From 1990 through 2000, the Defendant was forced to eliminate some positions due to automation of the equipment and/or financial problems. In 2000, the Defendant instituted a formal Reduction in Work Force (RIF). The Defendant had in effect, for some time prior to this RIF, a written policy to determine the order in which employees would be laid off in the event of a RIF. The Plaintiffs were laid off in October of 2000. The Defendant continued to lose business, and in 2003, the plant closed.
Within a year of the lay-offs, on May 16, 2001, the Plaintiffs filed a petition against Constar, Inc, its Operations Manager, Art Setty (Setty), and Plant Manager, Dennis Charbonnet (Charbonnet) for gender and age discrimination, pursuant to the Louisiana Employment Discrimination Law, La. R.S. 23:301. The Plaintiffs also alleged various other torts.[1] Setty, Charbonnet and all claims but the gender discrimination claims were dismissed in a summary judgment on December 9, 2003. In February of 2004, the Defendant filed another motion for summary judgment relative to the gender discrimination action, exceptions of prescription and no cause of action. The motion for summary judgment was denied prior to trial. The exceptions were denied on the first day of trial.
A judge trial was held on March 8, 9 and 10, 2004. Following presentation of the Plaintiff's case, the Defendant filed a motion for involuntary dismissal, which was denied by the trial judge. The case was left open for the introduction of additional evidence, after which the parties submitted post-trial briefs and the matter was taken under advisement. On July 9, 2204, the trial judge rendered a judgment in favor of the Defendant, finding that the Plaintiffs failed to prove gender discrimination. On July 28, 2004, the Defendant filed a Motion to Tax Costs against the Plaintiffs, which was denied by the trial judge.
In the Plaintiffs' appeal, they allege that the trial judge erred, because she erroneously disregarded overwhelming statistical evidence produced by their expert that supported the Plaintiffs' claim under the disparate impact and disparate treatment theories. The Plaintiffs further contend that the trial judge erred in equating the onerous "business necessity" burden *1245 of proof required of the Defendant under the disparate impact theory, with the minimal, preliminary articulation of a facially legitimate reason needed to shift the burden back to plaintiff, and failed to recognize that the Defendant did not produce any evidence of "business necessity" consistent with the appropriate legal standard.
The Defendant filed an answer to the appeal on the issue of trial cost and requests costs for appeal, attorney's fees and costs and damages for frivolous appeal.

PEREMPTORY EXCEPTIONS AND MOTION FOR INVOLUNTARY DISMISSAL
In the Defendant's brief, it argues that this Court should reverse the trial judge's rulings denying the peremptory exceptions of prescription and no cause of action, (La. C.C.P. art. 927), and the denial of the Defendant's motion for involuntary dismissal made following the conclusion of the Plaintiffs' case. (La. C.C.P. art. 1672 B). The written judgments denying the exceptions are not in the record, but are mentioned in the minutes and the trial transcript. No application for supervisory writs was filed challenging those rulings. The Defendant also did not file a cross-appeal, although it filed an answer to the appeal pursuant to La. C.C.P. art. 2133. However, the answer to appeal asks for relief only as to the trial judge's denial of the Defendant's motion to assess costs against the Plaintiffs.
La. C.C.P. art. 2133 states, "The answer filed by the appellee shall be equivalent to an appeal on his part from any portion of the judgment rendered against him and of which he complains in his answer." An answer to the appeal restricts this Court's review to the issue stated in the answer to the appeal. Thus, the trial judge's denial of the exception of prescription and the denial of the motion for involuntary dismissal is not properly before us on appeal since the Defendant did not complain of them in its answer to appeal, or file a cross-appeal asking for those rulings to be reversed.

NO CAUSE OF ACTION
Since the courts can recognize a no cause of action on its own motion, we will address the issue. See: C.C.P. art. 927.
The Defendant contends that Louisiana law on discrimination does not recognize a cause of action for the "disparate impact" of policies and actions that result in unintentional discrimination.
A cause of action is "an act by a defendant which gives a plaintiff a right to invoke judicial interference on his behalf." Trahan v. Liberty Mutual Insurance Company, 314 So.2d 350, 353 (La.1975). See: Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1238 (La.1993). In Trahan, the court pointed out the difference between a demand, which is "the object of the suit," and a cause of action, which is "the state of facts which gives a party a right to judicially assert an action against the defendant." Thus, cause of action, as used in the context of the peremptory exception, means the operative facts which give rise to the plaintiff's right to judicially assert the action against the defendant. A cause of action is an act on the part of a defendant which gives rise to a plaintiff's cause of complaint; "the existence of those facts which give a party a right to judicial interference in his behalf"; the situation or state of facts which entitles a party to sustain an action." Hope v. Madison, 192 La. 593, 606, 188 So. 711, 715 (1939). See: Everything on Wheels Subaru, Inc. v. Subaru South, Inc., 616 So.2d 1234, 1238 (La.1993).[2]
*1246 The cause of action in this case is for gender discrimination under Louisiana law, regardless of the theory upon which it is grounded. "Disparate impact" is one legal theory upon which any plaintiff may rely to recover damages for the fact that the actions of the defendant impacted the protected class (gender, age, race, religion), such as to constitute discrimination. Although facts are necessary to show disparate impact, it is not the cause of action. Thus, we find that the no cause of action was properly denied. Nevertheless, under either disparate treatment or disparate impact, the Plaintiffs failed to prove gender discrimination.

DISCRIMINATION
Louisiana courts look to federal jurisprudence to interpret Louisiana discrimination laws as they are derived in part from the federal law. Bustamento v. Tucker, 607 So.2d 532, 538 n. 6 (La.1992); King v. Phelps Dunbar, L.L.P., 98-1805, p. 7 (La.6/4/99), 743 So.2d 181, 187; Motton v. Lockheed Martin Corp., 03-0962, p. 6 (La.App. 4th Cir.3/2/05), 900 So.2d 901, 909. Under federal law, employment criteria causing a discriminatory result, such as the "education" and RIF policies herein, may be challenged under either a disparate treatment or disparate impact analysis or both. The disparate treatment model is based on section 703(a)(1) of Title VII, 42 U.S.C. § 2000e-2(a)(1), which provides that it is an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of race or sex. Carpenter v. Stephen F. Austin State University, 706 F.2d 608, 619 (C.A.Tex.1983). The disparate impact model is based on section 703(a)(2), 42 U.S.C. § 2000e-2(a)(2), which forbids an employer to "limit, segregate, or classify" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of race or sex.[3] In Carpenter, 706 F.2d at 619-620, the court stated:
Generally, the class must prove in a disparate treatment case the employer's "pattern and practice" of race or sex discrimination, see, e.g., International *1247 Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and establish discriminatory motivation or intent by direct or circumstantial evidence. Id. Under the disparate impact theory, the plaintiff class must set forth discrete, facially neutral practices that have a more severe impact on the protected group than on the unprotected group. See, e.g., Griggs v. Duke Power Company, 401 U.S. 424, 431-33, 91 S.Ct. 849, 854, 28 L.Ed.2d 158 (1971) (high school diploma requirement); Dothard v. Rawlinson, 433 U.S. 321, 329-30, 97 S.Ct. 2720, 2727, 53 L.Ed.2d 786 (1977) (height and weight requirements). The plaintiff is not required to prove the employer's discriminatory intent in a disparate impact case. [Emphasis added.]
The Plaintiffs' claims were brought solely under the Louisiana law on discrimination. La. R.S. 23:332 states in part:
A. It shall be unlawful discrimination in employment for an employer to engage in any of the following practices:
(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin.
(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual's race, color, religion, sex, or national origin.... [Emphasis added.]
The courts have recognized that discrimination questions are sensitive and difficult, and that seldom is there testimony by eyewitnesses to the employer's mental processes. Motton, 03-0962 at pp. 6-7, 900 So.2d at 909.[4] Thus, the courts employ the analysis set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 678 (1973), that is principally based on circumstantial evidence. Motton, 03-0962, p. 7 (La.App. 4th Cir.3/2/05), 900 So.2d 901, 909. Under McDonnell Douglas, the plaintiff must first prove by a preponderance of the evidence a prima facie case of discrimination. McDonnell Douglas, 93 S.Ct. at 1824; Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); Motton, 03-0962 at p. 7, 900 So.2d at 909. If the plaintiff succeeds in proving the prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell Douglas, 93 S.Ct. at 1824; Burdine, 101 S.Ct. at 1093; Motton, 03-0962 at pp. 10-11, 900 So.2d at 911. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. McDonnell Douglas, 93 S.Ct. at 1824; Burdine, 101 S.Ct. at 1093; Motton, 03-0962 at pp. 13-14, 900 So.2d at 913.

STATISTICAL DATA
Plaintiffs argue that they presented statistical evidence by Dr. James Richardson, an economics professor at Louisiana State University, who demonstrated that the odds against hiring so few women as operators, assuming even a restrictive female *1248 population in the comparative labor pool were astronomical, in the absence of discrimination. However, the trial judge rejected the analysis because it was too broad, accepting the Defendant's argument that the only relevant data would have been the percentage of females that had applied for an operator's job and whether they had been hired. Since the Defendant had not kept those records, which they disposed of after one year, the data was not available. The Plaintiffs argue that because the specific information was not available, the more general population analysis was relevant. Furthermore, they argue that the fact that the Defendant did not hire any women operators after March of 1990,[5] while 147 men had been hired, is overwhelming evidence of gender discrimination.
We agree with the Plaintiffs that alternative methodologies are acceptable evidence where the preferred statistics are impossible to obtain. See: Malave v. Potter, 320 F.3d 321 (2nd Cir.2003). Thus, the statistics and analysis employed by the Plaintiffs' expert are relevant. However, a trial judge is not bound by the testimony of expert witnesses and can accept or reject the expert's conclusions. Once an expert is permitted to testify in his field, the trier of fact has great discretion to accept or reject the expert's opinion, which goes to the credibility of the witness. State v. St. Charles Airline Lands, Inc., 03-1292, p. 13 (La.App. 5th Cir.4/27/04), 871 So.2d 674, 683. When findings are based on the credibility of witnesses, the manifest error standard demands great deference to the factfinder, as only the factfinder can observe the variations in demeanor and tone of voice that bear on credibility. Id. On appellate review, it is the reviewing court's function to determine whether the trial court's findings were manifestly erroneous or clearly wrong. St. Charles Airline, 03-1292 at p. 13, 871 So.2d at 683. When there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. Ultimately, the question of whether the Defendant policies discriminated against females through disparate treatment or disparate impact is a factual finding made after an analysis of the parties shifting burdens of proof in light of the evidence. Our review of the trial judge's conclusions in this regard is subject to the manifest error standard of review. Motton, 03-0962 at p. 16, 900 So.2d at 914.

TESTIMONY
The evidence shows that the Defendant was engaged in a highly competitive business. When the plant first opened, it primarily made dairy bottles. As the business grew, it made bottles for the soda industry as well. Initially, the bottles were similar in shape. Later, the customers began to request customized shapes, necessitating changes in the types of equipment. Over those years, the Defendant used "palletizer," "boxing," and bottle-making machines.
The first palletizer machines, which were used to stack the bottles for shipment, were not automated. By 2003, at least two were totally automated. Those early models were the simplest pieces of equipment in the plant. The palletizer set out layers of bottles, and put them on a "carriage." The buttons on the older machine had instructions on each and every function. The buttons were marked "go forward," "drop down," and "reverse." Another button, called a "gripper," put sheets between the layers to separate them from each other.
*1249 In the early 1980's, the Defendant also used "boxing" machines for those customers who requested boxes. The employees making boxes manually loaded the box on a bed, pushed a button, and added glue where needed. A technician adjusted the square, fixed jams or adjusted the conveyers. The operators here were essentially "attendants." Eventually, that function was eliminated when customers opted to box their own bottles.
The bottle-making machines also changed over time as the technology got better, generating greater speeds in making, decorating, and packaging the bottles, and by reducing the number of steps in the process from two to one. The major changes began in the late 1980's. The plant had initially started with "blow mold" technology, which used slower equipment. However, the technology gradually advanced, requiring more instrumentation, processing and special maintenance. The first change was the installation of reheat-blow (RHB) machines (the first polyethylene terephthalate (aka PET, PETE, PETP) technology[6]) for the making of soda bottles. This required more of the operator than pushing buttons. In the older blow molding machines, there might have been 20 spots to place the bottle material, whereas with the newer automated machines, there were 100 points of placement for the plastic material. In addition, the pressure in the machines increased, requiring more precision and decision-making in where to focus the heat, how long to leave the material in the pre blow stage before the pressure would blow, and when to open and close the valves. The RHB machines were replaced in 1994 with a more sophisticated machine, the French-made "Sidels." The time cycle went from six seconds for four bottles, to two seconds per cycle. One Side replaced two RHB machines and operated at twice the speed. This reduced the number of operators needed. By October of 2000, depending on the skill, experience, and knowledge of the basics of the machines of the person hired to perform the operator jobs, the training was approximately nine months to a year. By the time of trial, the national company was training operators for one year at its training facility in Orlando, Florida. In 2000, all of the employees hired as operators were qualified to operate, troubleshoot and maintain the equipment. Although technicians were available to fix or maintain the equipment, the number of technicians fluctuated. The goal was to reduce their numbers, as all through the 1990's, the Defendant was losing customers and needed to run the plant more efficiently. As of 2000, the number of technicians and personnel available to help teach the machinery operation had been reduced to one per shift. That person was also a supervisor.
Setty, the Operations Manager from 1993 until the Defendant closed, said that he could not have replaced ten operators in 2000 with the ten Plaintiffs without closing the plant. In 2000, the Defendant was facing severe costs cut-backs, and it would have taken too long to train the unskilled Plaintiffs. He contended that any prior experience that the Plaintiffs may have had was with the older machinery, and that experience would not have helped them understand the complexity of the newer machines.[7] Thus, even if there was no written RIF's policy of not allowing senior workers in a lower classification to replace junior employees in a higher classification, *1250 it would not have been financially feasible to allow the Plaintiffs to "bump" the more junior operators.
The Plaintiffs contend that their prior experience should have been considered during the hiring process over the years from 1989 until 2000, because the operators hired by the Defendant did not all have vocational-technical certificates, and were hired on the basis of experience alone. Sandy Dents, Gail LeBouef and Gloria Knight all became operators and stated that the machines took weeks, not months to learn. The Plaintiffs also contend that obtaining the educational certificates discriminated against them because they had no one to cover their shifts, they had family issues, or they could not afford the tuition.
The Defendant's witnesses testified that the experience used as a criteria for those hires was in an area of machine operator that gave those men the basic knowledge of how the complex machinery worked, thus reducing the training time, and allowing them to troubleshoot and maintain the equipment. Although the Plaintiffs contend that there were technicians on the floor available for fixing and maintaining the equipment, Setty stated that the use of technicians was being reduced for financial reasons, and that by 2000, from numerous techs, line chiefs and relief operators that helped new hires learn the job, the numbers had been reduced. In 2000, there was one line chief/supervisor per shift. Thus, it was more efficient to have operators that did not need a technician to solve every problem. Furthermore, the operators were working more than one machine, due to the efficiency of the sophisticated equipment. In addition, he and Paul Gautreaux (Gautreaux), the personnel manager, noted that the educational requirement in lieu of experience insured that the employee had the basic understanding needed to perform the jobs. Vocational-technical education was instituted because the Defendant wanted a more educated work force. It was not designed to discriminate against women. Furthermore, Setty and Gautreaux testified that the Defendant had educational funds available, shift schedules were often changed to accommodate employees and the only person who ever asked for the assistance was given it and actually was promoted to operator upon receiving her certificate. The two witnesses testified that the men in lower classifications that did not have the requisite experience also had to adjust to shift changes to obtain the educational certificate. Setty noted that the Defendant had accommodated shifts changes for some of the Plaintiffs in order that they could ride with one another to work. He also testified that 8 packers or production workers promoted to operator in the 1980's had worked in labeling, on the RHB machines, and one had worked on the blow moulder machine, all of which had been changed in the 1990's. In regard to Dents, LeBouef, and Knight, he stated that those workers went from working years on the older blow machines to the newer technology, thus, reducing the learning time. That long-time experience helped those workers to adapt to the newer machines, unlike those that had only worked on the older palletizers, which only required button pushing. Setty stated that the reason that more men were operators in 2000 was because it was rare for a woman to apply. He said that the company was looking for skill level, regardless of gender. He admitted that the Defendant did not want "button pushers" training on the sophisticated equipment.
Setty testified that several positions came open during that time period, which was filled by other male employees, such as the janitor position and the resin control operator. Both positions required climbing ladders, and more physical duties *1251 than the Plaintiffs were doing. He and Gautreaux testified that the Plaintiffs were offered those positions in February and August of 2000, but they refused the positions because they were happy where they were and did not like all of the new job duties. However, Lucille Baker, testifying for all of the Plaintiffs, denied that they were ever offered those positions. Setty noted that, in 2000, one male employee was rehired as a fork-lift driver because he had experience in that job, which was a higher classification than packer. The Plaintiffs did not have the requisite experience.

PRIMA FACIE CASE
To prove a prima facie case, the Plaintiffs had to show that: (1) they are members of a protected class, (2) they were qualified to do the job, (3) they suffered an adverse employment action, and (4) others not in the protected group were treated more favorably than them. See: Motton, 03-0962 at p. 7, 900 So.2d at 910. To establish a prima facie case, a plaintiff need only make a very minimal showing." Id. [Emphasis added.]
The trial judge in this case determined that the Plaintiffs carried their burden of establishing a prima facie case of unlawful discrimination. The Defendant contends that this was error.
The facts show that before the educational policy was implemented, men and women packers or production workers had been promoted to operator, after receiving on-the-job training. From 1989 until 2000, only 5 of 147 operators that had been promoted or hired were women. The Plaintiffs here had all been packers for 20 years, and had been exclusively packers for the 12 years before the termination.

a) Written RIF policy
At the time the Plaintiffs were laid-off, a written policy was in effect that governed which employees would be terminated from employment first when a RIF was instituted. In that document, it is clear that no senior member of a lower classification, such as packers, could step into the job of a junior employee in a higher classification, such as operator. Within a classification, the lay-offs were based on seniority. The policy was followed during the lay-offs. The Plaintiffs argue that seniority within a class was not the only criteria, but that the decision had to be made using "objective criteria" including performance, attendance, ability to operate efficiently, knowledge of processes and equipment, safety compliance, disciplinary actions, work record and longevity of service. Lower classifications were to be reduced before the higher classifications.
There is no prima facie showing by the Plaintiffs that the written policy was put into operation to intentionally discriminate against women, or that it was motivated by an intent to discriminate against women (disparate treatment). Furthermore, the Plaintiffs failed to show that the policy had a greater adverse impact on women than men (disparate impact.) The policy was a business necessity implemented to provide an organized and non-whimsical solution to reductions in the workforce. It applied to all employees. Although these Plaintiffs were terminated, the more senior female workers were retained. Thus, as to the written RIF policy, the Plaintiffs failed to bear their burden of proof of gender discrimination. The trial judge did not err in this respect.

b) Educational Requirement
In regard to the unwritten educational/experience policy, the evidence shows that the equipment was upgraded significantly after 1989. Some jobs became automated, and the technology of the others became more sophisticated. According to the Defendant, from 1989 until *1252 2000, none of the Plaintiffs operated any equipment of any kind. The Plaintiffs also admitted that they could not perform the mechanical repair aspects of an operator's job description. Their experience with the equipment in the past had been limited to pushing a button to turn the equipment on or off, and clearing "jams." However, the evidence also showed that the Defendant employed repair mechanics, waived the educational requirement with some men experienced with other types of machinery, partial completion of a vocational-technical certification (per Paul Gautreaux, the personnel specialist), and did not require the certificate to relate specifically to equipment operation. Some of the Plaintiffs stated that they signed up for the operator's position, but did not follow through because of the educational requirement, or in one case, was denied due to the educational policy. We also note that the requirement is typed at the head of the notices of the operator's vacancy announcement sheets that were distributed among the employees. Although the Plaintiffs claim that Setty admitted that he did not want women working the machinery, we did not find this statement in the trial transcript. The Plaintiffs also stated that they were not told about the experience requirement, but none of them seriously inquired about the position.
The expert, Dr. Richardson, who used the "Binomial Distribution" test to compare probability calculations, concluded that it was one in a million chance of a woman being hired by the Defendant for that job, after comparing statistical data in the three Parish wide female population engaged in manufacturing of 16.3%, considering that three to five females had been hired. Dr. Stuart Wood, the Defendant's expert in economics and statistics, disagreed with Dr. Richardson's conclusions. He contended that the defect in Dr. Richardson's methodology was that it did not filter the general or manufacturing statistics to conform to the requirements of the Defendant's jobs. The trial judge agreed that Dr. Richardson used too broad a population base.
Although the Defendant's argument that the Plaintiffs failed to prove a prima facie case has some validity, we find that the trial judge's conclusion that the Plaintiffs made a prima facie case of discrimination under either the disparate treatment or disparate impact theory was not error relative to the educational/experience requirement for the operator's position, although we note that the proof of "qualifications" and the "application" aspects were very minimal. The burden therefore, shifted to the Defendant to proffer a legitimate, nondiscriminatory reason for the challenged employment action. Burdine, 101 S.Ct. at 1089.

LEGITIMATE, NONDISCRIMINATORY REASON FOR POLICY
According to Burdine, "The burden that shifts to the defendant is . . . to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred for legitimate, nondiscriminatory reasons. Id.; Motton, 03-0962 at p. 11, 900 So.2d at 911. The defendant need not prove that it was actually motivated by the proffered reason. Burdine,[8] 101 S.Ct. at 1089; Motton, 03-0962 at p. 11, 900 So.2d at 911. The proffered reason is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. Burdine, 101 S.Ct. at 1089; Motton, 03-0962 at p. 11, 900 So.2d at 911.
*1253 The Defendant produced evidence that the educational/experience was necessary given the sophistication of the machinery in 2000 and the fact that technicians and others that could help an unskilled worker learn the operation had been significantly reduced. Furthermore, they showed that the Defendant would not have been able to operate at all had it attempted to fill 10 operator positions with the 10 unskilled Plaintiffs. The Defendant's witnesses testified that the lay-off was necessary due to the financial condition of the company, that they followed a non-discriminatory method of reducing the work force by using the written policy, that the men hired for the position of operator after institution of the educational policy were preferred, not because of their gender, but because the machines had changed and became more technologically sophisticated. The evidence also showed that the hired or promoted men had either the educational background that related specifically to the job, or prior work experience with machine equipment operation and/or repairs. In addition, in 1989, the Defendant foresaw the need for a more educated work force, considering the technologically advances being made in the machinery. Although the technical employees increased from 1990-1995, it did decrease from 1995-2000, so the operators had to know more about fixing and maintaining the equipment as time went on. The hires that had experience were familiar with at least the basics of machinery operation. The women working as operators had prior long-time experience with the machinery. Furthermore, the Defendant's witnesses testified that the Defendant encouraged and assisted its employees to continue their education and to receive training to become qualified for promotion. It had financial assistance available through its Education Assistance Plan for those who requested it, and it provided job coverage during school attendance. Although the Plaintiffs denied it, the Defendant's witnesses stated that they had offered the Plaintiffs two different positions months before the RIF, which they turned down because they did not like the job description. All of the Plaintiffs admitted that they were content in their packers jobs.
The trial judge found that the Defendant met its burden by articulating a legitimate, neutral reason for establishing a policy of education or training for promoting or hiring operators, namely the use of more sophisticated and technologically advance equipment. She then found that as the Defendant showed a legitimate, non-discriminatory, and facially neutral reason for implementing the policies, the prima facie case of gender discrimination was negated, and the burden shifted to the Plaintiff to show with specificity that the Defendant's reasons are pretextual or that they were not justifiable by business necessity. We find no error in this finding by the trial judge.

PRETEXT FOR INTENTIONAL DISCRIMINATION
The burden then shifted to the Plaintiffs to produce evidence to demonstrate that the employer's presumably nondiscriminatory reason for laying them off was a pretext for intentional discrimination. Burdine, 101 S.Ct. at 1096; Motton, 03-0962 at pp. 13-14, 900 So.2d at 913.
The Plaintiffs argue that the educational requirement and experience level required for promotion was unnecessary as several women testified that the machines were not difficult to learn on-the-job. They noted that all of the men hired as operators had to undergo on the job training to learn how to work with the machinery. Furthermore, the Plaintiffs argue that it was undisputed that there were always technicians, *1254 master maintenance and preventive maintenance mechanics available to actually fix and service the machines. Therefore, it is contrary to the Defendant's witnesses' statements that such knowledge was necessary for the operator's job. Although Gautreaux testified that the company attempted to reduce the number of technicians over the years, he admitted that from 1990 to 1995, 50% more were hired.
The Plaintiffs argue that the educational policy and/ experience requirement inhibited their applying for the position because they could not afford school, and the Defendant failed to cooperate to accommodate their shift schedules while they attended school. They contend that the educational/skilled machinery experience was a pretext to keeping them from the higher classification. The Plaintiffs recognized that the evidence showed that only Olga LeBlanc attributed her failure to attend school to a lack of funds, only two Plaintiffs attributed their failure to attend school to not having replacements to cover their work shifts, and Brenda Lee, Beatrice Brackens, Jackie Matthews and Nettie Kirklin did not apply for a promotion at all. However, the Plaintiffs argue that those facts are irrelevant, because their lack of education made it futile for any of them to actually apply for the operator's position
Based on the evidence, the trial judge found that the Plaintiffs failed to prove that the implementation of the educational/experience requirements for promotion was a pretext for gender discrimination. After our review, we find no manifest error in that regard. Consequently, we further find that the trial judge did not err in finding that the Plaintiffs failed to prove gender discrimination, and in dismissing their suit against the Defendant.

DEFENDANT'S APPEAL
The Defendant contends that the trial judge erred in not assessing trial costs against the Plaintiffs. Furthermore, it requests appeal costs, and damages for frivolous appeal.
La. C.C.P. art. 1920 provides, "Unless the judgment provides otherwise, costs shall be paid by the party cast, and may be taxed by a rule to show cause. Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable." A trial court is afforded great discretion in its assessment of court costs, and can be reversed by an appellate court only on a showing of abuse of that discretion. Westley v. Allstate Ins. Co., 05-100, p. 15 (La.App. 5th Cir.5/31/05), 905 So.2d 1127, 1137. Appellate courts shall render any judgment which is just, legal, and proper upon the record on appeal, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as may be considered equitable. La. C.C.P. art. 2164. Therefore, both trial and appellate courts are vested with discretion in the apportionment of costs. Westley, 05-100 at pp. 15-16, 905 So.2d at 1137. Although we recognize that generally the prevailing party is not assessed with costs unless in some way he incurred additional costs pointlessly or engaged in other conduct, which justified an assessment of costs against him, (see Id.), nevertheless, the trial judge has discretion in this regard.
The trial judge declined to assess costs against the Plaintiffs in this case. Although we do not find that the Defendant incurred additional costs pointlessly or engaged in other conduct justifying the assessment of costs against it, the trial judge can assess costs against it based on her discretionary authority alone. After our review, we find the trial judge did not *1255 abuse her discretion in the assessment of costs. We furthermore, find no basis for an award of frivolous appeal. This was a complicated discrimination case and there were meritorious arguments on both sides.
Accordingly, the judgment of the trial judge is hereby affirmed. The costs of this appeal are assessed to each party.
AFFIRMED.
NOTES
[1] The Plaintiffs also alleged other claims which were dismissed. They alleged negligent and/or intentional misrepresentation, detrimental reliance, intentional infliction of emotional distress, and conspiracy to discriminate in connection therewith, under La.R.S. 51:2256(2). La.R.S. 51:2231 et seq. provides for the execution of federal anti-discrimination laws in the State of Louisiana and creates the Louisiana Commission on Human Rights (the Commission.) The Commission has the power to adjudicate claims of employment discrimination pursuant to La.R.S. 51:2231(C) and 51:2257. An individual alleging employment discrimination under La.R.S. 23:301 may file a written complaint with the Commission and have the allegations investigated and resolved by the Commission. See: King v. Phelps Dunbar, L.L.P., 98-1805, pp. 6-7 (La.6/4/99), 743 So.2d 181, 187.
[2] See discussion of the exception in Subaru and cited cases.
[3] See: 42 U.S.C.A. § 2000e-2 (k):

(k) Burden of proof in disparate impact cases (1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if
(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or
(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.(B)(i) With respect to demonstrating that a particular employment practice causes a disparate impact as described in subparagraph (A)(i), the complaining party shall demonstrate that each particular challenged employment practice elements causes a disparate impact, except that if the complaining party can demonstrate to the court that the element of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice.
(ii) If the respondent demonstrates that a specific employment practice does not cause the disparate impact, the respondent shall not be required to demonstrate that such practice is required by business necessity.
(C) The demonstration referred to by subparagraph (A)(ii) shall be in accordance with the law as it existed on June 4, 1989, with respect to the concept of "alternative employment practice".
(2) A demonstration that an employment practice is required by business necessity may not be used as a defense against a claim of intentional discrimination under this subchapter.
[4] Citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).
[5] One employee, Oretha Bell, was removed from her job as "operator trainee" in 1991, and replaced by a man, but was reinstated after her successful EEOC action.
[6] PET is a thermoplastic resin of polyester family used to make liquid containers.
[7] Setty listed the most complicated machines to the least: the Neecy (sic) bottle making machines, the Aokis, the Sidel blow equipment, the blow moulders, the RHB blow moulders, the labeling machines, and the packaging machines.
[8] The Court cited Board of Trustees of Keene State College v. Sweeney, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978).