# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 07-227


**ANDREW C. SCOTT AND ARCHIE E. THOMAS**

**VERSUS**

**OMEGA PROTEIN, INC.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, DOCKET NO. 10-16170
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE
**\*\*\*\*\*\*\*\*\*\***


## OSWALD A. DECUIR
## JUDGE

**\*\*\*\*\*\*\*\*\*\***


Court composed of Sylvia R. Cooks, Oswald A. Decuir and Billy H. Ezell, Judges.

**Cooks, J., dissents and assigns written reasons.**

                                                              **AFFIRMED.**

Leonard Knapp, Jr.
1109 Pithon Street
P.O. Box 1665
Lake Charles, LA  70602
(337) 439-1700
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Andrew C. Scott and Archie E. Thomas

Rene E. Thorne
Proskauer Rose, L.L.P.
909 Poydras Street, Suite 1100
New Orleans, LA  70112-4017
(504) 310-4088
COUNSEL FOR DEFENDANT/APPELLEE:
    Omega Protein, Inc.

**DECUIR, Judge.**

Plaintiffs, Archie Thomas and Andrew Scott, appeal the trial court's judgment finding the defendant-employer, Omega Protein, Inc., did not violate Louisiana's employment discrimination laws. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

In April of 2001, Thomas and Scott were hired as fishermen on the *Diamond Reef*, a fishing vessel owned and operated by Omega Protein. Omega Protein is a company engaged in the catching and processing of a particular species of fish, the common name of which is Menhaden, or as it is known in the local vernacular, "Pogy." The six-month fishing season for Menhaden in the Gulf of Mexico necessitates seasonal employment. At the end of each season, fishermen are "cut out" and may collect unemployment benefits or seek employment elsewhere. A fisherman may then reapply for a position with Omega Protein for the next season, as both Thomas and Scott did throughout the 1990s.

Halfway through the 2001 fishing season, Defendant's management determined the performance of the *Diamond Reef* was deficient and decided to call the boat back in to port and dismiss the captain and crew. On August 17, 2001, the *Diamond Reef* reached port and the crew was notified of their termination. David Ott, Omega Protein's Director of Human Resources and Risk Management, testified all the crew members, including two Mexican nationals, Adolfo Ibanez and Benjamin Zamora, were present in the conference room when the crew was advised of the termination. Other witnesses testified the two Mexican nationals were not present in the conference room. The captain, Charlie Robinson, and the first mate, both Caucasian American men, were escorted from the premises after they had obtained their personal effects from the boat. Other crew members, all African American men, went through

the usual cut out procedure, which entailed giving a cut out statement, removing their gear from the vessel, and leaving the premises. Ott acknowledged the two Mexican crew members did not give cut out statements and were not required to exit the premises; because they were hired under the federal H-2B visa program, Omega Protein was required to house, feed, and care for them until they could be returned to Mexico or until their term of employment ended. The remaining crew members were informed they would be considered for re-employment when positions became available. The *Diamond Reef* carried a crew of fourteen men.[1]

By the next week, three members of the *Diamond Reef*, Sharpe, Ibanez, and Zamora, were reassigned to other fishing vessels. Sharpe was rehired as a fisherman, which was a cut in pay from his position as first mate aboard the *Diamond Reef*. Eventually, five other dismissed members of the *Diamond Reef* were rehired by Omega Protein and assigned to other vessels. Captain Robinson and the pilot were not rehired, nor were the two plaintiffs in this case.

On November 12, 2001, Thomas filed a complaint with the Equal Employment Opportunity Commission (EEOC) alleging he was discriminated against because of his race and national origin. On February 4, 2002, Scott filed a similar EEOC complaint. Plaintiffs alleged they were available to fish for Omega Protein for the 2002 fishing season. Plaintiff Scott stated he was contacted in December 2001 by one of Omega's captains, Steve Mitchell, and asked to serve as a crew member aboard Mitchell's vessel for the upcoming 2002 season. However, by March 2002,

---

[1] The composition of the fourteen-man crew aboard the *Diamond Reef* was as follows: (1) the Captain, Charlie Robinson, Jr. (Caucasian); (2) the pilot, Robinson, III (Caucasian); (3) the mate, Sharpe (African-American); (4) the chief engineer, Druilet (African-American); (5) the second chief, Morris (African-American); (6) the cook, Smith, Jr. (African-American); (7) fisherman, Scott (African-American); (8) fisherman, Thomas (African-American); (9) fisherman, Sias (African-American); (10) fisherman, Speed (African-American); (11) fisherman, Ibanez (Mexican); (12) fisherman, Bell (African-American); (13) fisherman, Mayne (African-American); (14) fisherman, Zamora (Mexican).

Scott had not received any employment information as he always had in previous fishing seasons. Scott called Mitchell, who informed Scott that Omega personnel had told him he could not hire Scott as a member of his crew. When Scott called the Omega offices he was informed he was ineligible for the 2002 fishing season. The Plaintiffs eventually filed a Petition for Damages for Wrongful Termination and Retaliation against Defendant. The petition alleged "that defendant through its employees intentionally conspired not to hire Plaintiffs, Scott and Thomas, as a result of their filing an EEOC complaint of discrimination in retaliation of their charge, all in violation of La.R.S. 51:2231 *et seq.*" Plaintiffs requested they be reinstated as crew members and an injunction be "issued against Defendant not to discriminate against them because of their race, or retaliate against them for having filed a complaint with the EEOC, or alternatively, they be awarded further damages for the loss of wages during such time as they are unable to return to work."

At trial, David Ott testified regarding the reason for the immediate reassignment of the two Mexican fishermen. He explained Omega's contractual relationship with a company called International Labor which recruits Mexican fishermen for U.S. employment through the federal H-2B visa program. The program allows American companies to hire, temporarily, experienced foreign workers when skilled American workers are unavailable. Under the H-2B visa program, Omega Protein is obligated to take care of any Mexican workers it hires by providing them with food and lodging and ensuring their safety and well-being during the six-month fishing season while they are in the United States. In this case, the visas held by Ibanez and Zamora were valid until November 15, 2001, at which time they had to leave the United States. If an H-2B employee is dismissed before the end of the fishing season, Omega must notify the Immigration and Naturalization Service and

must pay the cost of return transportation of that employee to his fishing village in Mexico. Ott testified it would have cost Omega approximately $3,000 ($1,500 each) in recruitment fees *plus* return transportation costs for the two Mexican nationals if they were not retained for the remainder of the 2002 Menhaden fishing season. Conversely, when an H-2B employee finishes the season, he bears the cost of his own return trip to Mexico.

Ott testified that Plaintiffs Thomas and Scott were not treated any differently from Ibanez and Zamora because the Mexicans nationals were also laid off. He acknowledged that Ibanez and Zamora did not go through the cut out procedure with the Plaintiffs because Omega still had an obligation to provide them with food, lodging, and care until a decision could be made on what to do with them. Ott explained that the cut out procedure always takes place immediately before an employee leaves Omega's premises so that no accident or altercation in the interim goes unreported. Ott further explained that if the Mexicans had not been reassigned, Omega would have notified the Immigration and Naturalization Authority (INA) and incurred the expense of their transportation back to Mexico. Ott recognized Omega had an incentive to retain both Ibanez and Zamora. He stated:

> [W]e have to figure out the cost of doing business. And it was better for us to keep these gentlemen and keep them on the premises because of our obligations under the Visa; but also, it was decided that economically it would be better to keep them and reassign them to other vessels.

Ott emphasized the decision to retain the Mexican nationals was an economic one based on their status as H-2B visa holders, rather than their national origin or race.

At the close of Plaintiffs' case, the trial court dismissed the retaliation claim of Thomas, and at the close of trial, the retaliation claim of Scott was likewise dismissed. The trial court concluded that the decision not to rehire was made

independent of any news of an EEOC claim. After taking the remaining issues under advisement, the trial court ultimately determined there was no direct proof of racial discrimination, and "the reasons given by the defendant for the adverse employment action were . . . sound business decisions, devoid of any racial component."

Plaintiffs lodged a timely appeal with this court[2], and now assert the following assignments of error:

1. The Trial Court erred as a matter of law in his conclusion that Omega Protein did not violate La.R.S. 23:332(A) by retaining and/or reassigning the two Hispanic, Mexican nationals to two fisherman positions in their fleet, rather than give plaintiffs an opportunity, or, at least a level playing field, to secure the two fisherman positions available on Omega's fishing vessels.

2. The Trial Court erred as a matter of law in concluding that Omega Protein offered a legitimate and non-discriminatory reason for their actions.

3. As a result of the Trial Court's liability decisions, the Court erred in not awarding damages to plaintiffs.

4. As a result of the Trial Court's liability decision, the Court erred in not awarding attorney's fees and costs to the plaintiffs.

### ANALYSIS

The trial court based its decision in favor of Omega Protein on the finding that Plaintiffs were unable to establish proof of any racial discrimination in this case. We agree with this conclusion. The record does not support a claim based on racial discrimination. The issue in this appeal, however, is framed by the parties as one of national origin discrimination. Although much of the argument in the trial court focused on racial discrimination, the issue of national origin discrimination was also raised. Plaintiffs reference La.R.S. 23:332(A), which provides as follows:

---

[2] The original exhibits introduced during the trial of this matter were destroyed when Hurricane Rita struck the area. The parties submitted copies of the exhibits introduced at trial and filed a joint stipulation to that effect.

A. It shall be unlawful discrimination in employment for an employer to engage in any of the following practices:

(1) Intentionally fail or refuse to hire or to discharge any individual, or otherwise to intentionally discriminate against any individual with respect to his compensation, or his terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex, or national origin.

(2) Intentionally limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee, because of the individual's race, color, religion, sex, or national origin.

Thus, Plaintiffs contend Defendants discriminated against them based on their American "national origin," in violation of La.R.S. 23:332(A) and § 703 of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(A).

Because La.R.S.23:332(A) tracks the language found in Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, "Louisiana courts have looked to federal jurisprudence to interpret Louisiana discrimination laws." *King v. Phelps Dunbar, L.L.P.*, 98-1805, p. 7 (La. 6/8/99), 743 So.2d 181, 187. In Title VII claims, under 42 U.S.C.A. § 2000e-2(a)(1), as well as in cases applying Louisiana's employment discrimination laws, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or *national origin*." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63, 106 S.Ct. 2399, 2404 (1986.) (Emphasis added.) *See also Alphonse v. Omni Hotels Management Corp.*, 94-0157 (La.App. 4 Cir. 9/29/94), 643 So.2d 836.

In their first assignment of error, Plaintiffs contend the trial court erred in finding that Omega Protein did not violate La.R.S. 23:332(A) by retaining Ibanez and Zamora rather than affording Plaintiffs an opportunity to secure the two fisherman positions available. Plaintiffs acknowledge Title VII and La.R.S. 23:332(A) do not

prohibit all arbitrary employment decisions. There are permissible forms of discrimination that are not in violation of Title VII. For instance, there has been an historical practice of requiring citizenship as a condition of federal employment. *See Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334 (1973). Further, in 42 U.S.C. § 2000e-2(e), Congress created an exception that allowed discrimination when it is based on a bona fide occupational qualification reasonably necessary for the normal operation of that particular business:

> Notwithstanding any other provision of this subchapter, (1) it shall not be an unlawful employment practice for an employer to hire and employ employees, . . . on the basis of his religion, sex, or national origin in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise, . . .

The jurisprudence holds that employers may use such hiring criteria only if the employer can justify such criteria. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849 (1971). The employer must demonstrate that the criteria at issue must have "a manifest relationship to the employment in question." *Id*. at 432. A bona fide occupational qualification may be, for instance, certain physical standards or requirements deemed necessary for job performance. Nevertheless, the business necessity exception is not applicable in this instance as national origin was not a criteria used by Omega Protein in its hiring protocol. The question, rather, is whether the Plaintiffs' national origin resulted in discrimination against them at the time of the discharge of the *Diamond Reef* crew.

What constitutes discrimination based on national origin has not been addressed frequently by the courts, and this case is one of first impression in Louisiana. One commentary noted there has "been a remarkable scarcity of analysis and commentary regarding the 'national origin' term." Note, *Los Olvidados: On the Making of Invisible People*, 70 NYU L.Rev. 965, 985 (1995). The Equal

Employment Opportunity Commission (EEOC) defines national origin discrimination broadly as "including, but not limited to, the denial of equal employment opportunity because of an individual's, or his or her ancestor's place of origin; . . ." 29 C.F.R. § 1606.1 (2003). The EEOC amended the above regulation in 1980 to replace "country of origin" with "place of origin" in order to dissuade any "reference to a sovereign nation." *Id.*

*Espinoza* is the only case in which the United States Supreme Court has directly addressed the meaning of national origin during the forty years of Title VII's existence. The Court there acknowledged the lack of legislative history involved in defining national origin. The Court also explained a change from an earlier version of Title VII. Originally, Title VII applied to "national origin or ancestry." *Espinoza*, 414 U.S. at 89. However, in the final version of the Act, the word "ancestry" was deleted. The *Espinoza* court noted that "the deletion of the word 'ancestry' was not intended as a material change." *Id.* This suggests the Court considered "national origin" and "ancestry" as the same.

Explaining that national origin and citizenship status are closely related, the *Espinoza* court noted that there may be many situations where discrimination on the basis of citizenship would have the effect of discriminating on the basis of national origin. The Court stated:

> In some instances, for example, a citizenship requirement might be but one part of a wider scheme of unlawful national-origin discrimination. In other cases, an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination. Certainly Tit. VII prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin. "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).

*Id.* at 92. Nevertheless, because the defendant in *Espinoza* hired almost exclusively

Mexican-Americans who were U.S. citizens, the Court found the defendant did not discriminate against the plaintiff-prospective employee based on her Mexican national origin, but rather, on alienage.

In the instant case, Omega Protein argues no discrimination occurred because it favored only the H-2B visa status of Ibanez and Zamora, not their Mexican national origin over the Plaintiffs' United States national origin. The plaintiffs argue in response that although Title VII does not protect against alienage discrimination, it does protect against national origin discrimination, and thus this court should find Title VII's protections extend to native born citizens fighting employer preferences for alien workers.

The burden of proving that the defendants intentionally discriminated rests with the plaintiffs. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089 (1981). A plaintiff must initially establish a *prima facie* case of discrimination. *Id*. A plaintiff establishes a *prima facie* case by showing that he: (1) is a member of a protected class, (2) was qualified for the position, (3) was terminated, and (4) was replaced by someone outside the protected class. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 587 (5th Cir.1998), *rehearing en banc granted*, 169 F.3d 215 (5th Cir.), *opinion reinstated in pertinent part*, 182 F.3d 333 (5th Cir.1999). A plaintiff need make only a "very minimal" showing to establish a *prima facie* case. *Lee v. Constar, Inc.*, 05-633 (La.App. 5 Cir. 2/14/06), 921 So.2d 1240, 1251.

By satisfying the *prima facie* requirements, a plaintiff eliminates "the most common nondiscriminatory reasons for demotion and firing: that he was unqualified for the position or that the position was no longer available." *Saint Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 527, 113 S.Ct. 2742, 2758 (1993), *citing Burdine*, 450

U.S. at 254, 101 S.Ct. at 1096. Once established, the plaintiff's *prima facie* case raises an inference of intentional discrimination and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Burdine*, supra. "If the defendant comes forward with a reason, which, if believed, would support a finding that the challenged action was nondiscriminatory, the inference raised by the plaintiff's prima facie case drops from the case." *LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 448 (5th Cir.1996). The plaintiff then has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision. *McDonnell Douglas Corp. V. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

While the Plaintiffs contend they clearly met their burden of proving a *prima facie* case of discrimination, we find the required elements of a discrimination claim based on national origin are missing. While the Plaintiffs offered evidence that they are both African Americans, the question of whether their American national origin is a protected class is unanswered. Whether they were qualified for the fisherman position with Omega Protein is also questionable given the Plaintiffs' evidence that their names were placed on a list of ineligible candidates for employment. Similarly, while the evidence is clear that the Plaintiffs were indeed replaced by Ibanez and Zamora, the record also shows that other African Americans who were not part of the H-2B visa program were rehired in place of the Plaintiffs.

However, assuming *arguendo,* that the Plaintiffs presented a *prima facie* case sufficient to raise an inference of national origin employment discrimination, we turn now to Omega Protein's evidence of its legitimate, nondiscriminatory reason for the challenged employment action.

A review of the record, and particularly the candid testimony of David Ott, reveals the primary reason both Ibanez and Zamora received preferential treatment over other employees was an economic one based on their status as H-2B visa holders. Ott acknowledged if the Mexicans were not rehired "then you're talking about a loss of money," and conceded Defendant had an economic incentive to retain Ibanez and Zamora over its other employees. Thus, the Plaintiffs argue that because of their status as H-2B visa holders, both Ibanez and Zamora were automatically rehired after the termination of the *Diamond Reef* crew. In making this argument, however, the Plaintiffs ignore the unrefuted evidence of Zamora's excellent reputation with other Omega captains and the testimony that he would have been chosen over either Plaintiff had such a choice been available. The argument also ignores the testimony concerning the Mexican workers' experience, having been specifically recruited as fishermen from coastal fishing villages. Nevertheless, both parties agree the primary reason Ibanez and Zamora remained on the boat after the Plaintiffs were discharged was the fact that Omega Protein had to fulfill its obligations to house, feed, and care for them until their employment status was decided.

This case ultimately turns on the question of an employer's obligations under the H-2B visa program. Once a foreign worker has arrived in the United States, an employer is under strict rules to properly care for and oversee that worker. An H-2B visa authorizes aliens to come "temporarily to the United States to perform . . . temporary service or labor if unemployed persons capable of performing such services or labor cannot be found in this country." See 8 U.S.C. § 1101(a)(15)(H)(ii)(b). The regulations for an employer to qualify to employ H-2B aliens are found in 8 C.F.R. § 214.2(h)(6):

> (6) *Petition for alien to perform temporary nonagricultural services or labor (H-2B) – (i) General.* An H-2B non-agricultural temporary worker is an alien who is coming temporarily to the United States to perform temporary services or labor, is not displacing United States workers capable of performing such services or labor, and whose employment is not adversely affecting the wages and working conditions of United States workers.

The H-2B visa program prohibits the use of such employees if the result is to displace United States workers. Contrary to the Plaintiffs' contention, that is not what occurred in the present case. Their argument that the Defendant's use of the H-2B workers served to protect the jobs of aliens at the cost of eliminating or reducing the availability of jobs for United States workers is misplaced.

To the contrary, the H-2B visa program allows American employers to bring in foreign workers when they have shown a need for those workers. The workers are here temporarily and for a certain term of employment. In this case, Omega Protein met its burden of showing the United States Department of Labor its need for foreign workers at a certain period of time in 2001. The Labor Department was satisfied with the evidence of need submitted by Omega Protein. Consequently, Ibanez and Zamora were approved for employment for one six-month fishing season. Omega Protein made the business decision, based on economics, to retain them for the three remaining months of the fishing season.

The H-2B visa program does not require a business to *return* foreign workers whenever an American becomes available for a job. The foreign workers have been brought here for a specific period of time, based on a proven need for their services. The employer's needs, however, can change during the course of the foreign workers' stay. Unforseen factors may change an employer's needs or change the availability of American workers and can include such arbitrary events as the weather, a fish kill, the closure of a competitor's business which floods the labor pool, or a contaminated

processing plant. Perhaps Omega Protein may not have been able to prove a need for foreign workers after the 2001 fishing season, but it did prove a need for the 2001 season. Those workers came for the period of time stated on the visa, and Omega Protein had legal and contractual obligations for that period of time. Fulfilling those obligations simply cannot be equated with national origin discrimination.

We find Omega Protein met its burden of proving a legitimate, neutral reason for rehiring Ibanez and Zamora rather than Plaintiffs Scott and Thomas. Omega Protein was compelled to fulfill its obligations under the H-2B visa program or suffer financial consequences, and it had responsibilities to Ibanez and Zamora personally which had to be met. The burden of proof then shifted back to the Plaintiffs to show that Omega Protein's actions, specifically, were either pretextual or otherwise unjustified.

In *Lee v. Constar, Inc.,*, 05-633 (La.App. 5 Cir. 2/14/06), 921 So.2d 1240, 1253, the fifth circuit addressed this shifting burden of proof:

> The trial judge found that the Defendant met its burden by articulating a legitimate, neutral reason for establishing a policy of education or training for promoting or hiring operators, namely the use of more sophisticated and technologically advance equipment. [The court] then found that as the Defendant showed a legitimate, non-discriminatory, and facially neutral reason for implementing the policies, the *prima facie* case of gender discrimination was negated, and the burden shifted to the Plaintiff to show with specificity that the Defendant's reasons are pretextual or that they were not justifiable by business necessity. We find no error in this finding by the trial judge.

Our review of the record unveils no evidence of pretextual or unjustified actions on the part of Omega Protein. The Plaintiffs did not attempt to overcome Omega Protein's nondiscriminatory reasons for rehiring Ibanez and Zamora, but rather, attempted to prove their case simply by characterizing the Defendant's actions as discriminatory. They merely reasserted their evidence, as did the plaintiffs in the racial discrimination case of *Ott v. Families Helping Families of Greater New*

-13-

*Orleans*, 05-1324 (La.App. 4 Cir. 8/16/06), 940 So.2d 1.  The trial court found the Plaintiffs failed to meet their burden of proof, and we find no manifest error in this factual conclusion.

## DECREE

The trial judge found that the Plaintiffs failed to prove that Omega Protein's decision to retain Ibanez and Zamora was racially motivated.  In this appeal, we find Omega Protein's employment action was not a pretext for national origin discrimination, and we further find that the Plaintiffs failed to prove national origin discrimination.  Upon review, we find no manifest error in the dismissal of the Plaintiffs' suit against the Defendant.

For the above and foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to the Plaintiffs.


**AFFIRMED.**

ANDREW C. SCOTT AND ARCHIE E. THOMAS

VERSUS

OMEGA PROTEIN, INC.

**COOKS, J., dissents.**

I disagree with the majority's decision to affirm the trial court's judgment, and specifically find Plaintiffs have established a violation of the prohibition against national origin discrimination as provided in Title VII and La.R.S. 23:332.

The majority first concludes Plaintiffs failed to establish a *prima facie* case of discrimination on national origin grounds. I disagree. Initially, I note a plaintiff need only make a "very minimal" showing to establish a *prima facie* case. *Lee v. Constar, Inc.*, 05-633 (La.App. 5 Cir. 2/14/06), 921 So.2d 1240, 1251. Defendant freely admitted at trial that it gave preference to its H-2B visa employees over its other employees. Therefore, Plaintiffs met their burden of proving a *prima facie* case of discrimination.

Defendant argues no national origin discrimination occurred, in this instance, because the decision was based on the alien status of the Mexican nationals and not their Mexican national origin over U.S. national origin. However, as *Espinoza* noted, the link between citizenship and U.S. national origin is very closely related, and here the employer's preferences undeniably involve some reliance on national origin. Though Title VII does not protect against alienage discrimination, it does protect against national origin discrimination. I am firmly convinced Title VII's protections

should extend to native born US citizens fighting employer preferences for alien workers. See Bloomekatz, *Rethinking Immigration Status Discrimination and Exploitation in the Low-Wage Workplace*, 54 UCLA L.Rev. 1963 (August, 2007), stating "if one approaches citizenship status from the perspective of native-born U.S. workers, one can suggest doctrinal space for their claims under Title VII, even within the confines of [*Espinoza*]." Defendant's practice of favoring continued employment of foreign nationals holding H-2B visas had the purpose and effect of discriminating against U.S. workers because of the U.S. workers' place of origin. Thus, the discrimination in this case occurred on national origin grounds.

The majority also questions "[w]hether [Plaintiffs] were qualified for the fisherman position with Omega Protein . . . given the Plaintiffs' evidence that their names were placed on a list of ineligible candidates for employment." However, there was testimony from Captain Matthew Gaskins, who captained another boat for Omega, that less than one week after the cutout of the *Diamond Reef* he offered Plaintiff Scott a job. Captain Gaskins testified he had a temporary fisherman position available and became aware of Scott from a "list of men – that you could hire or offer a job to," and he was "told by personnel he could hire Andrew Scott." Omega also set forth assertions that Plaintiffs were not ideal employees and would not have been rehired before the Mexican nationals under any conditions. They contend Plaintiff Scott became argumentative with Omega personnel over the cutout procedure, and because of that behavior it was determined "Omega would be better off without him." However, the decision to retain the Mexican nationals clearly was made before the cutout procedure took place, as evidenced by the fact the Mexican nationals did not participate in the cutout procedure; and Scott's attempt to voice objection to a discriminatory procedure cannot provide a legal basis for Defendant to avoid the

consequences of engaging in a prohibited employment practice. The record as a whole, and specifically the testimony of David Ott, make it clear that the economic considerations involved in using H-2B visa holders was the dominant factor in the decision to favor the Mexican nationals. The arguments set forth by Defendant that Plaintiffs "would not have been rehired regardless of the visa status of the Mexican national workers" are not borne out by the record, and arguably appear crafted in response to Plaintiffs' lawsuit.

Once established, the plaintiff's *prima facie* case raises an inference of intentional discrimination and the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Burdine*, supra. The majority found that Omega met its burden of proving a legitimate, nondiscriminatory reason for rehiring the Mexican nationals rather than the Plaintiffs. In reaching this finding, the majority discounts Plaintiffs' argument that Defendant's use of the H-2Bworkers served to protect the jobs of aliens at the cost of eliminating or reducing the availability of jobs for native-born U.S. workers. Plaintiffs correctly points out the H-2B visa program specifically prohibits the use of such employees if the result is to displace United States workers. That is *exactly what occurred* in the present case. Defendant's use of the H-2B workers served to protect the jobs of aliens at the cost of eliminating or reducing the availability of jobs for United States workers. This is inconsistent with the stated goal of the H-2B visa program, and I find the majority erred in finding otherwise. The majority's position shields the Defendant from any "real" burden to show initially that the decision to secure H-2B visa permits for non-U.S. workers was "need-based" as required by the H-2B program as opposed to one based on a discriminatory purpose, i.e., to hire foreign laborers over U.S. workers equally qualified and available to work.

Defendant's admitted preference for alien workers clearly is discriminatory in effect. Consistent with Title VII, the U.S. Supreme Court has held that employers cannot engage in employment practices that are facially neutral but discriminatory in their effect. *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849 (1971). Even if an employer claims the bottom line does not show discriminatory impact, the U.S. Supreme Court nonetheless holds that prohibited employment practices are unlawful. *Connecticut v. Teal*, 457 U.S. 440, 451, 102 S.Ct 2525, (1982). The proffered reasons for Omega's preferential treatment in favor of the Mexican nationals were economic considerations based on their status as H-2B visa holders; reasons I believe that, in consequence, discriminate against U.S. workers. Omega's bareboned proffered reason is insufficient to refute Plaintiffs' claim without a showing that the decision to initially hire the Mexican nationals through the H-2B Visa program was not itself a subterfuge to shield the company's true intent to unlawfully discriminate against U.S. workers. The evidence in this case suggests no shortage of qualified U.S. workers existed at the time; in fact they were routinely released and rehired contingent only upon the Captain's preference.